**UNITED STATES of America**

v.

**DOWLING, Reuben.**

**GOVERNMENT OF THE VIRGIN ISLANDS**

v.

**DOWLING, Reuben.**

**Appeal of Reuben DOWLING.**

**No. 87–3650.**

United States Court of Appeals, Third Circuit.

Argued April 22, 1988.

Decided Aug. 22, 1988.

Rehearing and Rehearing In Banc Denied Sept. 28, 1988.

Robert L. Tucker, Federal Public Defender, Melody M. Walcott (argued), Asst. Federal Public Defender, Christiansted, St. Croix, U.S. V.I., for appellant.

Terry M. Halpern, U.S. Atty., Jim U. Oliver, Jr. (argued), Asst. U.S. Atty., D.V.I., Christiansted, St. Croix, U.S. V.I., for appellees.

Before SEITZ, SLOVITER, and BECKER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Reuben Dowling, who was convicted by a jury of several offenses arising out of a bank robbery, appeals on various evidentiary grounds. Dowling contends that the trial court abused its discretion in refusing to suppress photo identifications, in refusing to allow testimony by Dowling's expert witness on human perception, and in disallowing defense questioning of a witness concerning a civil suit arising out of the robbery, and that the court erred in admitting into evidence testimony concerning a crime for which Dowling previously had been acquitted.

## I.

### Facts

On the afternoon of July 8, 1985, a man armed with a pistol and disguised by a ski mask robbed the First Pennsylvania Bank in Frederiksted, St. Croix, taking approximately seven thousand dollars from two cash drawers. The robber ran from the bank to a parking lot across the street, then returned to the middle of the street and, pointing a gun, commandeered a passing taxi van. After a struggle with the taxi driver, the robber drove away in the van and took off his mask.

Antonio Messer, who had been in the bank but had managed to slip out in the course of the robbery, observed the robber's getaway. He testified that he was approximately fifteen feet away from the robber as he drove past and got a good look at the robber's face. He identified Dowling as the robber.

About a mile outside of Frederiksted, the robber drove the van into the front yard of Hayde Pichardo. Upset because her young children were playing there, Pichardo, who was observing events from her bedroom window, shouted an obscenity at the driver, getting a good look at his face when he made a full stop and stuck out his head to see who had hurled the invective at him. Pichardo's seventeen-year-old daughter, Amada Rosario, was also in the house and was watching through the window as the driver slowed down and put his head outside. The robber subsequently abandoned the van and fled on foot. Both Pichardo and Rosario identified Dowling as the driver.

Dowling was charged by information with the federal crimes of bank robbery, 18 U.S.C. § 2113(a) (Supp. IV 1986), and armed robbery, *id.* § 2113(d) (1982), and, under territorial law, with two counts of first-degree robbery, V.I. Code Ann. tit. 14, § 1862(2) (Supp.1987), two counts of third-degree assault, *id.* § 297(2), illegal possession of a firearm during the commission of a violent crime, *id.* §§ 2253(a), 2254, grand larceny, *id.* § 1083(1) (1964), and unauthorized use of a vehicle, *id.* § 1382 (Supp. 1986). He pled not guilty to all the charges.

Dowling's first trial ended in a hung jury. Dowling's conviction following a second trial was reversed on appeal.[1] After a third trial, Dowling was acquitted of the federal and territorial counts alleging possession of a firearm and convicted of the remaining counts. This appeal followed.

## II.

### The Photo Identifications

Dowling argues that the district court should have suppressed the evidence of the pre-trial identifications of Dowling by Pichardo, Rosario and Messer through several photographic arrays. He contends that the arrays were impermissibly suggestive and gave rise to a substantial likelihood of irreparable misidentification. The district court examined the photo arrays and concluded they were not suggestive.

Pichardo and Rosario were separately shown first an array consisting of five photographs, including one of Dowling that was several years old (Gov't Trial Exhibit

---

**1.** We held that because there was a strong possibility that the jury had been exposed to extra-record information as to this case and Dowling's prior criminal conduct, the trial court erred in failing to develop a record sufficient to permit evaluation of the potential prejudice to the defendant. *Government of the Virgin Islands v. Dowling,* 814 F.2d 134 (3d Cir.1987).

15). Both identified Dowling but stated that he looked younger in the photograph. Some time later they were shown an array of six photographs, none of Dowling (Gov't Trial Exhibit 11). They each said the person driving the van was not included. They were then shown an array of six color photographs containing a recent picture of Dowling (Gov't Trial Exhibit 12). Although they initially denied recognizing anyone, each identified Dowling the next day.[2]

Messer was shown the array without Dowling (Exhibit 11) and the array with Dowling's recent picture (Exhibit 12), and picked no one out of the former and Dowling out of the latter.

Dowling complains that he is wearing a red tee-shirt in that exhibit and was pictured with individuals of noticeably different builds and skin hues. However, some of the other men also wore colored tee-shirts. In all three arrays, the photographs were virtually identical in composition and quality, and the men portrayed were reasonably comparable in dress and appearance. We agree with the district court that the photo arrays were not suggestive.

A few days after a line-up, at which Pichardo, Rosario and Messer failed to identify Dowling,[3] they were separately shown an array of photographs taken of the participants in the line-up and each picked out Dowling. Dowling contends that the process was impermissibly suggestive because his photograph was the only one repeated in the photo arrays that the principal witnesses saw prior to the line-up and prior to their viewing of the two arrays of photographs drawn from the line-up. The district court concluded that this repetition standing alone did not affect suggestiveness.

Under some circumstances, repetition of a photograph could be suggestive. However, a degree of suggestiveness does not in itself require exclusion of the evidence. "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). If there was a suggestive identification procedure, the question becomes whether the suggestiveness "created 'a very substantial likelihood of misidentification.'" *United States v. Milhollan*, 599 F.2d 518, 522–23 (3d Cir.) (quoting *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972)), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979). This question is to be answered with reference to the "totality of the circumstances," with particular attention paid to such relevant factors as the quality of the witnesses' original opportunity to view the criminal, their degree of attention, their level of certainty when confronted with the suspect or his image, and the length of time between the crime and the confrontation. *See Neil*, 409 U.S. at 199–200, 93 S.Ct. at 382–83; *Manson*, 432 U.S. at 114–16, 97 S.Ct. at 2253–54.

Here the witnesses all observed Dowling in good light, and had adequate, if not ample, time to form an impression. Messer, whose view was perhaps the least advantageous, made a deliberate effort to make an effective observation because, he testified, he knew he would be asked by the police for a description. Rosario and Pichardo were also more than just casual observers because Dowling was an undesirable intruder. All three witnesses were presented with photo arrays soon after the robbery, and all three identified Dowling's picture from the first array. All three picked no one from the pre-lineup array in which Dowling's photo was absent.

**2.** At trial, they explained that they had been reluctant to get involved.

**3.** Pichardo and Rosario testified they had recently seen a movie in which, in the words of Pichardo, one of the men in a line-up "jumped through the glass and the thing fall on top of them and he take the gun and shoot everybody," App. at 258, and were too frightened at the line-up to identify anyone to the police. Rosario stated at trial that she had recognized the defendant. Messer testified that "I know that he was in there" but that he did not make a line-up identification because he was scared and because there were differences in Dowling's weight and hair-style as he appeared at the line-up and Messer's recollection of the robber.

Against this is to be weighed the slight, and likely inadvertent, suggestiveness of the repeated use of different photographs of ·Dowling in succeeding photo arrays. There is no evidence that the police added in any way to the possible suggestiveness of the repetition, nor that they availed themselves of the photo arrays unnecessarily. Under these circumstances, we cannot say that there was a "very substantial likelihood of misidentification," and therefore the district court did not violate Dowling's right to due process in denying his motion to suppress.[4]

### III.

### *Admission of Expert Testimony*

■ Dowling contends that the district court abused its discretion in excluding the testimony of Dr. Harry Krop, who Dowling proffered as an expert on the psychological and physiological factors influencing the reliability of eyewitness identifications. The district court, following the dictates of *United States v. Sebetich,* 776 F.2d 412, 419 (3d Cir.1985), *cert. denied,* — U.S. ——, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988), and *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985), conducted an extensive *in limine* hearing. The court held that although Krop qualified as an expert in eyewitness identification, the testimony would not be admitted.

The court gave two reasons for its ruling. The court noted first that Dowling gave the government only five days' notice of the proposed proffer, and stated that "we are inclined to bar the testimony for this reason alone." App. at 368. In *Downing,* we stated that the trial court could consider "[t]he extent to which the adverse party has had notice of the evidence and an

opportunity to conduct its own tests or produce opposing experts." 753 F.2d at 1241. The late proffer substantially prejudiced the government because, on such short notice, it could not reasonably be expected to search for its own expert and find one available to come to the Virgin Islands in time to be given the available facts and the opportunity to assimilate them. We therefore cannot hold that the district court abused its discretion in declining to admit the testimony on this ground alone.

The district court found "an additional compelling reason" to bar the testimony on the merits, concluding that the testimony would not aid the jury in reaching an accurate resolution. This, of course, as Judge Becker stated in his trailblazing opinion in *Downing,* is "[t]he touchstone of Rule 702." 753 F.2d at 1235.[5]

In *Downing,* we held that the district court should balance the general reliability of the scientific principles and their potential in aiding the jury against the likelihood that such information would mislead or overwhelm a jury. 753 F.2d at 1240. In addition, as Judge Becker thereafter explained in *Sebetich,* "admission depends upon the 'fit', *i.e.,* a specific proffer that the testimony will focus on particular characteristics of the eyewitness identification at issue and discuss how those characteristics call into question the reliability of the identification." *Sebetich,* 776 F.2d at 419.

The district court here recognized the "fairly established though controversial" nature of Krop's field, App. at 386, but found that "there was no testimony tying the specific data in the area of eye-witness identification to the eye-witness identifica-

---

4. Dowling also contends that the district court abused its discretion in failing to exclude the 1979 picture of Dowling because it was described at trial as the "old" or "1979 photograph", thereby suggesting that Dowling must previously have had contact with the police. Although a different description might have been preferable, the inference that Dowling suggests the jury could have drawn is speculative. The photograph was not a "mug-shot" that was clearly identifiable as the product of an arrest, and its introduction was not reversible error.

*See United States v. Hines,* 470 F.2d 225, 229 (3d Cir.1972), *cert. denied,* 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973).

5. Fed.R.Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

tions under consideration here." App. at 386–87.[6]

From our review of the transcripts of the *in limine* hearing, in which Krop was questioned on the application of his expertise to the eyewitness, photographic and line-up identifications of the principal prosecution witnesses, Pichardo, Messer and Rosario, we find adequate support for the district court's conclusion. Krop testified that serious stress at the moment of observation usually reduces recall. Although this was arguably relevant as to Pichardo, who may have been afraid that her children were in danger or angry at the person who endangered them, Krop himself testified that Messer "probably would not have been in a high stress situation" and "would probably have a fairly good reliability for recall," App. at 53, and that it "does not sound like [Rosario] was in a high level of stress" when she viewed Dowling in the van, App. at 65.

Krop referred to the "weapon focus phenomena," App. at 33, the tendency of a person to focus more on the weapon than on the person wielding it, but there was no assertion that any of these witnesses made their observations while faced with a weapon. Similarly, Krop testified that fifteen seconds is "generally viewed as the minimal amount of time that a person has to view a situation to be able to give fairly accurate recall," App. at 48, but there was no testimony at the hearing that any of the witnesses had less than fifteen seconds in which to view the suspect; on the contrary, in the Messer and Pichardo fact-patterns presented to Krop both were said to have had thirty seconds. App. at 53, 55–56. Krop testified that reliability was impaired when the witness was younger than thirteen or fourteen or older than sixty-five, but there was no evidence that the witnesses were in those age groups.

Krop also proffered various observations on the photo array identifications, but conceded under questioning by the court that virtually all his observations on the photo arrays were based on or equivalent to those to be derived from common sense. Krop's observation that witnesses presented with a series of photo arrays in which only the suspect's photo is repeated may "recognize" the suspect in one of the latter arrays based only on his familiarity from the earlier ones is of limited value in this case because, as we noted earlier, Dowling's picture was not repeated in each of the three pre-lineup arrays. Finally, Krop did not suggest that his testimony had any particular relevance to the identifications of the post-lineup pictures; instead he stated that "in terms of the lineup ..., it sounds like where psychological theory is more relevant would be in terms of the original ... perception ... as opposed to the methodological identification during the lineup." App. at 85.

As these examples suggest, nearly all the factors Krop was prepared to testify affected witness reliability were not present in this case. Further, many of his observations were of the type no expertise was required to make. While the relevance of the testimony at least as to Pichardo's reliability is a closer issue, the district court properly applied the teachings of *Downing*, and we cannot say that its decision to bar the evidence was an abuse of discretion. *See Downing*, 753 F.2d at 1240; *see also Sebetich*, 776 F.2d at 419.

## IV.

### *Evidence of a Witness' Prior Civil Suit*

Dowling also contends that the district court erred in disallowing Dowling's questioning of Messer regarding his loss of a civil suit against the bank for recovery of money he allegedly lost in the bank robbery. Dowling argues that because the

---

**6.** Dowling contends that the court erred in stating "that there were no scientific studies, treatises, etc. upon which Dr. Krop's testimony would be based," Appellant's Brief at 9, but our reading of the district court's opinion is different. Having reached the issue of "fit," the court had necessarily found there to be a sufficient scientific basis for Krop's testimony, and the court's statement that "there was simply no proffered proof reflecting treatises, reports, workshop results, research data or the like, *as to the possible misidentifications in this case,"* App. at 387 (emphasis added), went to the lack of a connection between Krop's acknowledged expertise and the particular facts presented.

civil suit had been characterized by the judge presiding in that case as "bordering on the frivolous" and because the verdict represented the jury's rejection of Messer's claim that he left money on the counter of the bank during the robbery, this was relevant cross-examination of Messer which he should have been able to use to impeach Messer's credibility.

 Under Fed.R.Evid. 608(b), the district court has the discretion to admit evidence of specific instances of conduct to impeach a witness' credibility "if probative of truthfulness or untruthfulness." *See United States v. Bocra,* 623 F.2d 281, 287–88 (3d Cir.), (review for abuse of discretion), *cert. denied,* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980). The Advisory Committee Notes to Fed.R.Evid. 608(b) caution that "the overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.*

In this case, the district court noted that the civil jury's decision could have been based on grounds other than disbelief in Messer, and that examination on the entire civil suit was "far too much outside of the issue." App. at 220–21. The court did allow Dowling to use previously introduced photographs of the bank during the robbery to impeach Messer insofar as he testified on direct that he left the money on the counter. The court did not abuse its discretion in holding that the danger of confusion so outweighed the probative value of the evidence as to justify barring that line of questioning.

## V.

### *Evidence of Acts Subject to a Prior Acquittal*

### A.

#### *Propriety of the Evidence*

 We turn finally to the most troublesome issue raised by this appeal, the court's admission of the testimony of Vena Henry, who described how a man wearing a knitted mask with cut out eyes (of a different color than the one worn by the bank robber) and carrying a small handgun (which was similar to the black silvery gun used in the bank robbery), accompanied by Delroy Christian, broke into her home in Frederiksted two weeks after the robbery, and how, in a struggle, she pulled the mask off the intruder, whom she identified as Dowling. App. at 143–44. Dowling was thereafter charged by the Government of the Virgin Islands with burglary, attempted robbery, assault, and weapons offenses, and was acquitted after a trial. App. at 147; Information, Criminal No. 85–64.

Dowling argues that the introduction of Henry's testimony was in violation of Fed.R.Evid. 404(b) [7] and improperly prejudiced him under Fed.R.Evid. 403. Dowling relies on our decision in *United States v. Keller,* 624 F.2d 1154, 1159 (3d Cir.1980), the closest precedent in this court.

The defendant in *Keller,* who had been convicted of conspiracy to distribute a controlled substance following the jury's rejection of his entrapment defense, claimed on appeal that the trial court had erred in permitting the government to undermine his defense by questioning him about other drug transactions for which he had been prosecuted and acquitted. We reversed, holding that the doctrine of collateral estoppel barred the evidence. *Id.* at 1157–60.

In *Keller,* we referred to the constitutional doctrine of collateral estoppel included in the Fifth Amendment's double jeopardy clause, *see, e.g., Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Venable,* 585 F.2d 71 (3d Cir.1978), but we relied for our holding on this court's precedent, *see United States v. Simon,* 225 F.2d 260 (3d Cir. 1955); *United States v. De Angelo,* 138

---

**7.** Evidence of "other crimes, wrongs, or acts" may be admitted to prove, among other things, identity, but not "to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b); *see, e.g., United States v. Milhollan,* 599 F.2d 518, 524–25 (3d Cir.), *cert. denied,* 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979). *See generally* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[15] (1986) (discussing proof of identity through "evidence of a crime which has the same unusual features as the charged crime").

F.2d 466 (3d Cir.1943), that "consistently applied [the doctrine of collateral estoppel] to bar the evidentiary use of crimes for which the defendant has been acquitted." 624 F.2d at 1160. We quoted with approval the following statement by the Fifth Circuit:

[i]t is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit.

*Wingate v. Wainwright*, 464 F.2d 209, 215 (5th Cir.1972), *quoted in Keller*, 624 F.2d at 1160.

The government argues that *Keller* notwithstanding, the evidence was admissible in this case because the issue of Dowling's identity and his use of a knitted mask and small handgun in the Henry incident was not determined in his favor by the acquittal verdict. It cites as legal authority a district court opinion in *United States v. Hill*, 550 F.Supp. 983 (E.D.Pa.1982), *aff'd mem.*, 716 F.2d 893 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984), which it states holds that *Keller* is only applicable where the evidentiary fact sought to be introduced in a subsequent trial "has been actually determined in defendant's favor in the trial which resulted in defendant's acquittal." Appellee's Brief at 22. That is not what *Hill* held.

In *Hill*, the defendant, who had been tried at his first trial on seven counts, was acquitted on two and found guilty on five. After this court reversed and remanded for a new trial on those counts, defendant was again found guilty. Obviously, as the district court there noted, evidence in support of the five counts on which Hill was previously found guilty was not precluded by our opinion in *Keller*. 550 F.Supp. at 988. The court further determined that even if it was error to admit evidence of the distribution for which Hill was acquitted, it was harmless beyond a reasonable doubt. *Id.* at 988–89. Nothing in *Hill* puts the gloss on *Keller* that the government argues.[8]

Nor is there any evidence to support the government's premise that the issue of Dowling's identity and his use of the knitted mask and small handgun was not determined in his favor by the acquittal. No extrinsic evidence of the record in the earlier case against Dowling was introduced. Apparently, the same trial judge presided in both. The following colloquy in this case is the only light shed on the events in the other:

[ASS'T U.S. ATTORNEY]: Your Honor, having the case described to me—I wasn't here—but the Defense in the case presented, not through Mr. Dowling but through his co-defendant Delroy Christian, it was not a robbery. The two of them merely came to retrieve from an individual in the house money from an individual in the house.

THE COURT: Mr. Dowling's presence in the house was not seriously contested in the case *but he stated the general defense.* Mr. Dowling, I don't think, took the stand.

App. at 154 (emphasis added).

This is an insufficient basis on which to conclude that the issue of Dowling's participation in the robbery was not determined. Since Dowling entered a not guilty plea and did not testify, the government was re-

---

**8.** Moreover, in *Keller* we rejected a virtually identical argument to that made by the government here, saying:

The Government argues ... that ... Keller did not deny the fact of his participation in the drug distributions but claimed that he was excused from criminal prosecution because he was entrapped. The Government contends that collateral estoppel is inapplicable because "[i]t is not the *result* of the prior case that was material, but rather the *facts* which were undisputed." Thus, the Government would have us hold that the prior conduct is admissible notwithstanding the determination by the earlier fact finder that the defendant's state of knowledge and level of participation did not satisfy the requirement of the criminal law. We decline to so hold since that would eviscerate the effect of the prior acquittal.

*Keller*, 624 F.2d at 1160 (citations omitted); *accord Blackburn v. Cross*, 510 F.2d 1014, 1017 (5th Cir.1975) ("there is no difference between relitigating an ultimate fact or an evidentiary fact; relitigation of either is prohibited" by doctrine of collateral estoppel); *see also United States v. Crispino*, 586 F.Supp. 1525, 1530–32 (D.N.J.1984).

quired to prove all the elements of the case against him beyond a reasonable doubt. His co-defendant's explanation imposed no burden on him. Even assuming that Dowling's identity and presence in Henry's house were not specifically disputed, we believe that the government cannot legitimately assert that evidence concerning one element of an offense is separable for evidentiary purposes from a jury's general verdict of acquittal merely because it was not directly contradicted.[9]

Even apart from *Keller*, we believe the evidence in this case was inadmissible. The Supreme Court has recently had occasion to consider the operation of Fed.R. Evid. 404(b) in *Huddleston v. United States*, — U.S. —, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (holding that a federal district court need not find that the government has proven the similar act by a preponderance of the evidence before it is admissible under Rule 404(b)). The Court stated that, "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at 1501. It follows that when the prior act sought to be introduced was the subject of an acquittal by a jury, a second jury should not be permitted to conclude "that the act occurred and that the defendant was the actor."

Even if the *Huddleston* analysis would not, of itself, exclude as irrelevant all acts which were the subject of a prior acquittal, in this case the evidence of pattern on which the district court relied was at best tenuous. The district court held that the evidence of the Henry incident "falls well within the ambit" of Rule 404(b) because "the common features that link the bank robbery and the later occurrence are largely the mask and the gun, albeit a mask of different color or the like, and no evidence that the gun was the same, except that it was a small caliber handgun." App. at 159–60.

The balance required by Fed.R.Evid. 403 necessitates a consideration of prejudice as well as probative value. In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (in banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), approvingly cited in *Huddleston*, 108 S.Ct. at 1501, the court pointed out that "[o]ne of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense." 582 F.2d at 914. The court continued, "[t]his danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." *Id.*

When the limited similarity of the alleged offense behavior in the bank robbery and the Henry incident is coupled with the fact that the jury's verdict in the Henry occurrence must be taken to signify that it was not proven that Dowling committed the "bad" act charged (either because it was not Dowling or it was not a robbery), the marginal relevance of the evidence was more than amply outweighed by the potential prejudice. *See United States v. Phillips*, 401 F.2d 301 (7th Cir.1968). We thus conclude that in addition to being inconsistent with *Keller*, the admission of the Henry testimony was an abuse of discretion.

## B.

### *Effect of the Error*

■ A new trial is necessary only if the error in admitting the evidence was not harmless. We need not in this case be convinced that the error was harmless beyond a reasonable doubt. In *United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987), this court held that when the challenged instruction did not affect a constitutional right, "we must ap-

---

**9.** This issue is distinguishable from that which arises when a defendant has been acquitted on one count of a multi-count indictment and is being retried on other counts. Courts have held that acquittal on one charge arising out of a set

of facts does not preclude the use of the same evidence to prove a second charge on retrial. *See United States v. Gentile*, 816 F.2d 1157, 1164 (7th Cir.1987). We express no view on that issue.

ply the 'highly probable' standard of appellate review to determine the harmlessness of the error." *Accord Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir.1976). We explained further that, " '[h]igh probability' requires that the court have a 'sure conviction that the error did not prejudice the defendant' but need not disprove every 'reasonable possibility' of prejudice." *Grayson,* 795 F.2d at 290 (citing *United States v. Jannotti,* 729 F.2d 213, 219–20 & n. 2 (3d Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984)).

■ The putative prejudice flowing from the admission of Henry's evidence is that it influenced the jury's conclusion that Dowling was the masked robber. However, as the district court stated at sentencing, the evidence was "overwhelming". Sentencing Transcript at 16. In this case, there were three positive identifications. Messer testified that he had "a clear recollection in [his] own mind of what the face of the man looked like" who ran from the bank and removed the mask from his head. App. at 201. He testified that it was a clear day and he had a clear view of what was going on. App. at 197–98. He stated that as the man passed him, "I knew I was trying to identify somebody, looking for a feature or face or something like that, because I know I would have to say something to the police officials or give a description or something like that." App. at 197.

Pichardo was equally certain in her identification of Dowling as the man who drove into her yard.[10] She stated, in identifying Dowling in the courtroom, "I could be dead and born again, and I will never forget that face. It's that gentleman sitting over there. I would never forget those eyes. I would never forget those looks." App. at 249. Rosario also gave a positive identification of Dowling at the trial. Messer not only saw the robber take off his mask, but pursued the taxi van in his own vehicle to where the van was abandoned near Pichardo's home in Estate Smithfield. This forg-

es an iron link between the eyewitness accounts of the robbery and the identifications of the van's driver by Pichardo and Rosario. Finally, as we discussed above, each of the eyewitnesses identified Dowling through various photographic arrays shown to them shortly after the robbery.

There was other strong evidence. Messer testified that the robber was tall, fit and clad in a green army shirt, a description that was corroborated by numerous witnesses. Bank employees Williams, Sanes, Austin, Moorehead and Santiago all remembered the robber wore a green army shirt, several of them also testifying that he was athletically built and six feet or more tall. Bank customer Fabio also testified that the robber was an athletically built man, about 6'1" tall, wearing a green shirt. A Special Agent of the F.B.I., who had used the bank security photographs of the robbery to estimate the robber's height, testified that he was probably at least 6 feet tall. Of course, the jury was able to judge for itself whether this description matched Dowling's physique.

The government also presented a strong circumstantial case hinging on the robber's haphazard getaway. The government's theory presented to the jury was that it was unlikely that a robber who took pains to conceal his face with a mask and who wore gloves to avoid fingerprints would have no better getaway plan than to hijack a taxi. Numerous witnesses testified that the robber had run around outside the bank after the robbery apparently looking for something. The government posited that the robber's original plan to leave by a getaway car had been foiled while he was in the bank.

The government presented the testimony of several witnesses to support this theory and to connect Dowling to the crime. Philip Tutein testified that Dowling had borrowed a white Volkswagen a day or two before the robbery. Anthon Christian, a police official, testified that on the morning of the robbery, he noticed a white Volks-

---

**10.** The defense brief concedes that the man who drove into the Pichardo yard was the bank robber.

wagen stalled on a road occupied by a man wearing a green army shirt and the same kind of hat from which the robber's mask was made, and that he noted the license number of the car, which was later identified as Tutein's. Police sergeant Anita Christian testified that at about the time of the robbery, she was patrolling in town and saw a white Volkswagen parked at a spot later described as near the bank. The front door of the car was open and it was occupied by two persons, one of whom was her cousin Delroy Christian. She asked the driver to close the door, and the car then drove off and out of town. Dowling himself testified that he knew Delroy Christian. He also admitted borrowing Tutein's white Volkswagen and was unable to proffer any evidence as to where he was on July 8.

Of course, we cannot entirely discount the possibility that there may have been some prejudice to Dowling by the introduction of Henry's testimony which, if credited, implicated Dowling in a prior bad act. Also, the government in its closing statement pointed to Henry's identification of Delroy Christian as accompanying Dowling, which could be seen as supporting the government's theory of the getaway car.

However, our standard on harmless error applicable here is not one of certainty of no prejudice, but one of "high probability". In that connection, we note that the district court did caution the jury in its general instructions as to the limited value of the Henry testimony. The court stated that the Henry testimony "was presented to you for you to consider in the contexts, and to the extent that it helps you in determining the identity of the person who committed the crimes at or near First Pennsylvania Bank on July 8, 1985. If it does not fall into that category, you may disregard it. Mr. Dowling was found not guilty of the crime of robbery in connection with that." Supp. App. at 29. The prosecutor also pointed in his closing to the limited

purpose for which the Henry evidence was admitted, and defense counsel stressed Dowling's acquittal in her opening statement to the jury.

Moreover, when Dowling testified in his own defense, he stated that he was acquitted in the Henry incident charge but admitted that he had been convicted of another bank robbery in 1979.[11] In light of that testimony, which was properly admitted, it is unlikely that the admission of the Henry testimony more than marginally affected the jury's overall character assessment of Dowling.

There are instances in which the erroneous admission of prior bad acts evidence will not be harmless. Evaluation of the prejudice occasioned by a trial error is a fact-specific process. In light of our review of the entire record, we conclude that there is a "high probability" that the error in admitting the Henry testimony did not prejudice Dowling. *See United States v. Ezzell*, 644 F.2d 1304, 1306 (9th Cir.1981) (where three eyewitnesses to bank robbery identified defendant and he was photographed by the security camera, error in admitting evidence of prior bank robbery was harmless).

### VI.

For the reasons set forth above, we will affirm the judgment of conviction.

---

**11.** Instructing on impeachment, the court stated: "[O]ne of the ways in which impeachment evidence is permitted is if a person testifies then that person may be demonstrated to have had a prior felony conviction and that that happened in this case when Mr. Dowling exercised his rights to take the stand and testify under oath. Then it was permitted to be shown that in 1979 he was convicted of the felony of bank robbery." Trial Transcript, September 24, at 38.