

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-28-1995

# United States v Emanuele

Precedential or Non-Precedential:

Docket 94-3283

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Emanuele" (1995). *1995 Decisions.* Paper 87.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/87

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-3283

_____

United States of America,


v.

Joseph Arthur Emanuele,

Appellant.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 94-cr-3)

_____

Argued January 31, 1995

Before: SCIRICA, ROTH, and SAROKIN, Circuit Judges

(Filed  March 28, 1995)

_____

                    Thomas S. White
                    Federal Public Defender
                    Michael D. Bartko (argued)
                    Karen S. Gerlach
                    Assistant Federal Public Defenders
                    415 Convention Tower, 960 Penn Ave.
                    Pittsburgh, PA 15222

                    Attorneys for Appellant

                    Frederick W. Thieman
                    United States Attorney
                    Bonnie R. Schlueter
                    Assistant United States Attorneys
                    633 United States Post Office &
                    Courthouse
                    Pittsburgh, PA 15219

John T. Bannon, Jr. (argued)
General Litigation & Legal Advice
Section, Criminal Division
P.O. Box 887 Ben Franklin Station
Washington, D.C. 20044

<u>Attorneys for Appellee</u>

_____

OPINION OF THE COURT

_____


SAROKIN, <u>Circuit Judge</u>:


Defendant was convicted of two counts of bank robbery in violation of 18 U.S.C. §2113(a). He appeals on the grounds that as to the central issue, identification, the district court erred by (1) permitting in-court identification testimony by the two key witnesses, after they had observed defendant in shackles escorted by U.S. Marshals and then discussed his identity; (2) denying the defendant's motion for a line-up prior to the testimony of the two witnesses; and (3) ordering defendant to shave his moustache, put on glasses supplied by the government, and stand before the jury.

The district court had jurisdiction pursuant to 18 U.S.C. §3231. Defendant filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. §1291.

I.

Defendant Joseph Arthur Emanuele was convicted of robbing two Integra Banks, the "Millvale Bank" and the "Waterworks Bank". Martha Hottel, a teller, observed the man who robbed the Millvale Bank standing at a writing table before he came to her window and demanded money. Five weeks later, when shown a six-photo array, she selected a photograph of the defendant but stated that she "wasn't one hundred percent sure" of her choice. Appendix ("App.") at 44. When shown a second array several weeks later, Hottel selected the photograph of someone other than defendant. The bank's security cameras malfunctioned without photographing the robber, and latent fingerprints from the writing table and bank door did not match those of defendant.

The man who robbed the Waterworks Bank demanded money from Lorraine Woessner, a teller. Woessner observed the man for several minutes at close range in the well-lit bank lobby. Shown a six-photo array that included a photograph of defendant shortly after the crime, Woessner was unable to identify the robber. App. at 44, 48. The one fingerprint taken from the Waterworks Bank did not match that of defendant, but the Waterworks Bank security cameras did photograph the robber.

The two tellers were subpoenaed by the government to testify, and after checking in at the U.S. Attorney's Office, they were directed to sit outside the courtroom. There, the tellers saw defendant led from the courtroom in manacles by U.S. Marshals. Though later Woessner could not remember for certain

who had spoken first, outside the courtroom the two tellers talked to each other about defendant, telling each other "it has to be him."  App. at 135.

Having learned of the encounter, defendant's attorney moved to suppress the tellers' anticipated in-court identification testimony as violative of defendant's right to due process, or in the alternative, for a court-ordered line-up.  The government conceded that it had been "careless," App. at 52, but argued that because the confrontation was inadvertent no constitutional violation had occurred.

The court denied the motion as to the testimony of Hottel, the teller who had identified defendant's photograph in one photospread but selected someone else in another.  App. at 73, 82.  As to the testimony of Woessner, who had failed to identify defendant's photograph in the only array she was shown, the court held a hearing out of the presence of the jury and ruled that the second teller's identification testimony was admissible.  The court made no specific findings of fact.  Both tellers took the stand and identified defendant as the robber.

During trial, three government witnesses, who knew defendant, testified that he was the person in the Waterworks Bank surveillance photographs, and three defense witnesses, who also knew him, testified that defendant was not the person in the photographs.  An expert witness, a surgeon, testified that he had compared the dimensions of defendant's face with those of the

face of the robber in the Waterworks Bank photographs and determined that defendant could not be the robber in the pictures. Two government experts testified in rebuttal that the surgeon's calculations were unreliable.

Defendant also challenges the district court's order requiring him to shave his moustache and put on glasses similar to ones worn by the Waterworks robber. At trial, the court had defendant wearing the glasses stand silently before the jury, which was instructed that "these are not glasses that were found anywhere. They have been supplied by the government." App. at 338. No witness was on the stand at the time.

After his conviction, defendant moved for a new trial based on the admission of the tellers' identification testimony and the orders to shave and wear glasses. The court held another hearing, at which time two receptionists from the U.S. Attorney's Office testified that they had told the tellers to sit outside the courtroom, as is the government's custom, without any specific instruction from the prosecutor on the case. The court denied the motion for a new trial. App. at 680-83.

II.

As with many evidentiary rulings, we review a decision to admit identification testimony over an objection for abuse of discretion. Government of Virgin Islands v. Riley, 973 F.2d 224, 226 (3d Cir. 1992). Where a motion to suppress has been denied, we review the order "for clear error as to the underlying facts,

but exercise plenary review as to its legality in the light of the court's properly found facts." United States v. Inigo, 925 F.2d 641, 656 (3d Cir. 1991). If the admission of identification testimony violated the due process clause, as defendant contends, then we will consider whether this constitutional error was harmless. Foster v. California, 394 U.S. 440, 444 (1969).

**A. Admissibility of identification testimony**

A government identification procedure violates due process when it is "unnecessarily suggestive" and creates a "substantial risk of misidentification." Riley, 973 F.2d at 228. See United States v. Stevens, 935 F.2d 1380, 1391-92 (3d Cir. 1991); United States v. Dowling, 855 F.2d 114, 117 (3d Cir. 1988), aff'd, 493 U.S. 342 (1990); Neil v. Biggers, 409 U.S. 188, 198-99 (1972). But see Reese v. Fulcomer, 946 F.2d 247, 258 (3d Cir. 1991) (standard is "'very substantial likelihood of irreparable misidentification'")(quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977) and Simmons v. United States, 390 U.S. 377, 384 (1968)), cert. denied, 112 S.Ct. 1679 (1992). A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony." Brathwaite, 432 U.S. at 106, 114. See also Reese, 946 F.2d at 258 (suggestive interaction that creates no risk of misidentification does not violate due process).

To determine reliability, we examine the identification procedure in light of the "totality of the circumstances." Riley, 973 F.2d at 228. These circumstances may include the witness' original opportunity to observe a defendant and the degree of attention during that observation; the accuracy of the initial description; the witness' degree of certainty when viewing a defendant or his image; and the length of time between the crime and the identification procedure. Biggers, 409 U.S. at 199-200; Brathwaite, 432 U.S. at 114; Riley, 973 F.2d at 228; Reese, 946 F.2d at 258; Dowling, 855 F.2d at 117.

Several aspects of the reliability inquiry deserve comment. First, this court suggested in Reese that to determine reliability we may also consider other evidence of the defendant's guilt, Reese, 946 F.2d at 259, n.7, a principle we applied in Riley as well. 973 F.2d at 228. The suggestion is contrary to the Supreme Court's guidance in Brathwaite that other evidence indicating a defendant's guilt "plays no part in our analysis" of reliability. Brathwaite, 432 U.S. at 116. Justice Stevens emphasized the point in his Brathwaite concurrence, applauding the majority opinion which "carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself." Brathwaite, 432 U.S. at 118 and note (Stevens, J., concurring). We caution, therefore, that only factors relating to the reliability of the identification will be relevant to a due process analysis.

Independent evidence of culpability will not cure a tainted identification procedure, nor will exculpatory information bar admission of reliable identification testimony.  We will consider other evidence only to determine whether an error, if present, was harmless.  Brathwaite, 432 U.S. at 118, note (Stevens, J. concurring).

Second, we note that the standard enunciated for reliability in Riley differs from that applied in Reese.  Compare Riley, 973 F.2d at 228 ("substantial risk of misidentification") with Reese, 946 F.2d at 258, 262 ("very substantial likelihood of irreparable misidentification").  As in Riley, our phrasing of the standard in Stevens and Dowling omitted the requirement of irreparability.  Stevens, 935 F.2d at 1391-92; Dowling, 855 F.2d at 117.  We conclude that our most recent statement of the standard, that of Riley, like our phrasings in Stevens and Dowling, most accurately reflects Supreme Court precedent.  Thus, we must decide whether there exists a "substantial risk of misidentification."

Third, previous courts, as the district court here, have wrestled with the degree of government complicity in a suggestive procedure that is necessary to implicate the due process clause.  Where the alleged taint concerns the composition of a line-up or photospread, the government's involvement is clear; where the challenge concerns an encounter between witness and defendant on the street, in the courthouse, or at a prison, some courts have held that the government cannot be held responsible.  See, e.g.,

Reese, 946 F.2d at 261 (procedure proper where no evidence that courthouse encounters "were deliberately arranged by the government"); Stevens, 935 F.2d at 1390 n.11 (quoting Wilson v. Commonwealth, 695 S.W.2d 854, 857 (Ky. 1985)(defendant must "show that the government's agents arranged the confrontation or took some action during the confrontation which singled out the defendant")).

We hold that the government's intent may be one factor in determining the risk of misidentification, but it is not an essential element of defendant's burden of proof. A series of events that is suggestive and creates a substantial risk of misidentification is no less a due process violation, even absent evil intent on the part of the government. Stated differently, governmental intent is one of many factors in the totality of circumstances, but we expressly do not require defendant to establish the government's state of mind. On the other hand, evidence that the government intended and arranged such an encounter would be a substantial factor in the court's analysis.

**B.  Application**

At the suppression hearing the district court determined neither whether the courthouse encounter was unnecessarily suggestive nor whether there was a substantial risk of misidentification. To the extent it considered the courthouse encounter, the court focussed on the government's intent. See

App. at 72, 87-88.[1]  Regarding the risk of misidentification, the court made no findings as to the Biggers factors and in fact instructed counsel that Woessner should "testify only on the issue of what happened yesterday."  App. at 90.  At the close of the hearing the court held:

> Okay.  I'm going to allow Miss Woessner to testify and I'm going to deny the request for the lineup at this point, based on this witness' testimony that she has an independent basis of her identification of the defendant.

App. at 138.

In essence, the district court relied on Woessner's testimony that notwithstanding the suggestive circumstances, she recognized the defendant.[2]  That testimony alone, even if believed by the trial court, would not be dispositive.  Indeed, if Woessner did not so testify, the issue would not even arise.  All of these instances are predicated upon a witness' insistence that an identification can be made notwithstanding suggestive circumstances, and there is frequently a good faith belief by the

---

1In its only writing on the topic, denying the motion for a new trial, the court concluded:

> [A]n incident occurred which did not involve a deliberate attempt by the Government to obtain a suggestive identification by any witness . . . What occurred was an inadvertent and unplanned viewing . . . the Court finds that . . . this was not an identification procedure designed and manufactured by the Government to bolster the witnesses' testimony at trial . . .

May 3, 1994 Order, App. at 683 (emphasis added).

2The dissent quite properly refers us to this testimony.

witness in such ability.  However, the sincerity or truthfulness of the witness must be considered along with the other Biggers factors in order to determine whether the risk of misidentification still exists, notwithstanding a witness' testimony to the contrary.  The trial court failed to consider the "totality of the circumstances," such as in this case the inability of the witness to recognize defendant in a photospread despite a sufficient opportunity to observe the robber at close range.  The court thus failed to apply the correct legal standard.  Because the factual record is complete and uncontroverted, however, we need not remand for further fact-finding.  We will apply the appropriate standard to the undisputed facts.

We evaluate first whether the interaction was unnecessarily suggestive.  It is undisputed that the two tellers were sitting outside the courtroom because the U.S. Attorney's receptionists had told them to be there, and that defendant was walked past them in handcuffs with a U.S. Marshal on each shoulder. Defendant had not asked to leave the courtroom -- he was ordered out when the court granted the government's motion to have defendant shave.

In the face of these events, the government directs our attention to Reese, where we concluded that it was not impermissibly suggestive for a victim to glimpse defendant three times in and around a courthouse.  946 F.2d at 261-62.  Our

analysis in Reese cited to and relied on United States v. Domina, 784 F.2d 1361, 1369-70 (9th Cir. 1986), cert. denied, 479 U.S. 1038 (1987), a decision which held that it was not unduly suggestive for a victim to view a defendant leaving the courtroom during recess, because the defendant was not handcuffed, not escorted by marshals, and not otherwise singled out. The circumstances here fit cleanly within the Domina exceptions cited in Reese, 946 F.2d at 261.

Nor are we persuaded by the government's invocation of two Eighth Circuit cases, United States v. Wade, 740 F.2d 625 (8th Cir. 1984), which we discussed in Reese, and United States v. Boykins, 966 F.2d 1240 (8th Cir. 1992), because each involve facts different from those here. Wade concerned a witness who, while looking into a courtroom from outside, was asked "in a nonleading fashion, shortly before she [took] the stand, whether she can identify a person." Wade, 740 F.2d at 628. The Eighth Circuit decided this was "the same question she will be asked while testifying" and was not impermissibly suggestive. Ibid. In Boykins, a witness recognized a defendant while walking to the courtroom and informed the prosecutor, who then accompanied the witness down the courthouse hallway to confirm the identification. Boykins, 966 F.2d at 1242. In Boykins the government did not single out the defendant. Furthermore, the failure of the witnesses in Wade and Boykins to identify a defendant in a previous photospread goes to the risk of

misidentification, not the suggestiveness of the courthouse confrontation.

We conclude that the confrontation was caused by the government, albeit inadvertently, and that to walk a defendant -- in shackles and with a U.S. Marshal at each side -- before the key identification witnesses is impermissibly suggestive.

The more difficult question is whether this impermissibly suggestive confrontation created a "substantial likelihood of misidentification," in light of the totality of circumstances. Riley, 973 F.2d at 228. First, though we will consider the reliability of each teller's testimony separately, we note several Biggers factors common to both: the two tellers (a) had several minutes to observe the robber, (b) at close range, (c) in a well-lit space. We agree with the government that the unobstructed view of both tellers during the robberies would strengthen the reliability of their testimony. But this point also supports defendant's position. The tellers' protracted and clear view of the robber highlights Woessner's failure to select defendant's photo in the array and Hottel's choice of a different photo in the second array shown her.

Second, Woessner testified that she recognized defendant immediately upon seeing him in the hallway. We will assume that her testimony was truthful and sincere.

Third, in the courthouse the two tellers observed defendant together and immediately spoke to each other about his identity,

prior to their testifying.  This conversation may well have overwhelmed any doubts Hottel or Woessner retained <u>after</u> observing defendant in the hallway, though given the indication that Hottel spoke to Woessner first, it is the reliability of Woessner's identification that is more impugned.  Woessner testified:

> Q     Did Miss Hottel tell you that was him?
>
> A     Ah, not right away, only when he was down the hall she mentioned that.  I mean, she spoke very softly and said that she, she was very upset because she didn't remember -- she didn't think she remembered what he looked like, but when she saw him she knew exactly that's who it was.
>
> . . .
>
> Q     She didn't say that was him to you?
>
> A     I think we both looked at each other and we were kind of it's, it has to be him (witness nodding.) . . .

App. at 134-35.

Finally, we consider a crucial difference between the circumstances of each teller's identification: the strength of the initial identification.  As we noted in <u>Reese</u>, whether subsequent viewings create a substantial risk of misidentification may depend on the strength and propriety of the initial identification.  946 F.2d at 262-63.  Upon viewing her first photospread, Hottel recognized defendant as the robber. Her slight qualification -- not being "one hundred percent sure" -- does not significantly diminish the import of that identification, nor does her subsequent selection of the

photograph of another person in a second array. In contrast, having scrutinized an array that included his photograph, Woessner failed to identify defendant as the robber. All the photospreads were viewed close in time to the respective robberies.

Thus, we face a situation in which the one eye-witness who would be able to identify the Waterworks robber and place defendant at the scene of the crime, could not, despite her opportunity to observe, recognize him in a photo array. That failure, coupled with the highly suggestive viewing of the defendant in conditions reeking of criminality, bolstered by the comments of another witness, render the in-court identification unreliable. The reaction "it has to be him" greatly diminishes the reliability of Woessner's identification and renders manifest the impact of her viewing defendant. In effect, the viewing communicated to the witness that the defendant was the robber, and there was no reliable evidence that she would have so concluded or testified absent that viewing.

Under such suspect circumstances, there clearly was a substantial risk of misidentification.[3] It was thus an abuse of

---

[3]Even were we to require proof that the risk of misidentification by Woessner was irreparable, Reese, 946 F.2d at 258, 262, our conclusion would be no different. Had the district court granted defendant's request for a line-up, the risk could perhaps have been "repaired," but under the facts of this case, the denial of the motion for a line-up for Woessner was an abuse of discretion. See United States v. Sebetich, 776 F.2d 412, 420-21 (3d Cir. 1985) (line-up or similar procedure should "be employed whenever necessary to ensure the accuracy and

discretion to admit Woessner's in-court identification testimony, in violation of defendant's right to due process.  As to Hottel, we conclude that her identification was reliable, and thus the admission of her testimony was not an abuse of discretion.

**C.   Harmless error analysis**

We must determine whether the admission of Woessner's identification testimony, which we have determined to be a constitutional error, was harmless.  Foster, 394 U.S. at 444.  We inquire whether the government has shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman v. California, 386 U.S. 18, 24 (1967).  "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."  Yates v. Evatt, 500 U.S. 391, 403 (1991).  See also United States v. Turcks, 41 F.3d 893, 898 (3d Cir. 1994).  Because we recognize the risk that Woessner's testimony about the Waterworks robbery may have had a spill-over effect on the Millvale robbery verdict, we will consider its impact on both convictions.

**1.   Waterworks conviction**

---

reliability of identifications"), cert. denied, 484 U.S. 1017 (1988).  Woessner's observation of defendant from the stand has destroyed the curative capacity of a line-up, and to remand for a line-up at this juncture would neither assist the court in determining the reliability of Woessner's testimony nor vindicate defendant's constitutional rights.

Apart from the contested surveillance photographs, there is no physical evidence linking defendant to the Waterworks robbery. The government refers us to evidence that defendant had an expensive drug addiction and unexplained income, as well as his post-arrest comment to another inmate that he would "beat the case." The government also relies on testimony of three persons, each of whom knew defendant, that he was the person in the Waterworks surveillance photographs. Of the government's three witnesses, one testified he had seen defendant only two or three times; the second was an admitted drug user on probation for a prior drug conviction; and the third was a convicted drug offender with pending charges for drug and prostitution offenses. App. at 166, 180, 191-93.

In his defense, defendant's mother and two friends testified that he was not the person in the surveillance photographs. App. at 344-45, 350, 362. Defendant also introduced expert testimony from a surgeon who had compared the dimensions of defendant's face to those of the robber in the surveillance photographs and concluded that he was "100 percent certain that they are not the same two people." App. at 407-08. In rebuttal, two government experts testified that the calculations made by defendant's expert were unreliable.

Woessner's testimony was crucial evidence on the robber's identity, the only issue at trial, and we cannot conclude that her testimony was "unimportant in relation to everything else the

jury considered" on the issue.  <u>Yates</u>, 500 U.S at 403.  A conviction should not be permitted to stand under such circumstances, and accordingly, we conclude that the error was not harmless.

Heeding the advice of Justice Black in his <u>Foster</u> dissent, we will clarify the proceedings to follow.  <u>Foster</u>, 394 U.S. at 445 (Black, J. dissenting) (where appellate court vacates conviction for unconstitutional admission of identification testimony, court should specify which testimony by witness is barred at retrial).  First, because the hearings on defendant's motions to suppress and for a new trial elicited all the relevant facts and left nothing in dispute, another hearing on the reliability of Woessner's identification testimony is unnecessary.  Second, on remand for a new trial, the district court is directed to exclude in-court and out-of-court identification testimony by Woessner.  To admit evidence of Woessner's recognition of defendant in the courthouse hallway would violate the due process clause for the same reasons as did admission of the in-court identification testimony.  Third, subject to any other objections not herein considered, we do not limit the ability of the government or defendant to question Woessner on other aspects of the case, including the robbery itself, her initial description, and her failure to select defendant's photograph from the array.

**2.   Millvale conviction**

As to the identity of the Millvale robber, Woessner's testimony was not directly relevant: she identified the Waterworks robber and said nothing about the Millvale robbery. The court recognizes, however, that there is a slight risk that Woessner's identification of defendant tended to buttress that of Hottel. However, we are satisfied that such risk is minimal and the error harmless because of the other evidence supporting defendant's conviction for the Millvale robbery. In addition to the same circumstantial evidence of defendant's drug addiction, unexplained income, and jailhouse statements, there was properly admitted in-court identification testimony by Hottel and evidence that she had recognized defendant in the first photo-array. That identification testimony, as stated previously, was supported by her opportunity to observe the robber.

We conclude that Woessner's identification was unimportant in relation to all else the jury considered on the issue of the Millvale robber's identity, and hence the admission of Woessner's testimony was harmless error in that conviction.

### III.

Over defendant's objection that it would violate due process and Fed.R.Evid. 403, the district court ordered the defendant to shave and to stand before the jury wearing a pair of glasses that resembled those worn by the robber and that were supplied by the government. Rule 403 provides: "Although relevant, evidence may

be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury."

In other cases, defendants have unsuccessfully invoked the Fifth Amendment privilege against self-incrimination to challenge motions requiring them to shave or put on clothing. See Holt v. United States, 218 U.S. 245, 252-53 (1910) (order to wear blouse); United States v. Valenzuela, 722 F.2d 1431, 1433 (9th Cir. 1983) (order to shave); United States v. Lamb, 575 F.2d 1310, 1316 (10th Cir.) (order to shave), cert. denied, 439 U.S. 854 (1978).

Here, defendant raises a due process objection to the orders. Some courtroom practices so deprive a defendant of his Sixth Amendment right to a fair trial that they implicate the due process clause. See Estelle v. Williams, 425 U.S. 501, 505-06 (1976)(compelling defendant to appear in prison uniform unconstitutional). Others, however, while seemingly prejudicial, may comport with the Sixth Amendment in particular circumstances. There is nothing inherently prejudicial in the orders requiring defendant to shave and wear glasses in this case, nor has defendant demonstrated that they so prejudiced him as to deny his constitutional right to a fair trial. Indeed, the court informed the jury before defendant put on the glasses that they were supplied by the government and had not been discovered with defendant or any of his belongings.

Defendant also contends that the orders to shave and wear glasses violated Rule 403, in that the court failed to weigh their probative and prejudicial values.  "As a general rule, we exercise great restraint in reviewing a district court's ruling on the admissibility of evidence under Rule 403."  Government of the Virgin Islands v. Archibald, 987 F.2d 180, 186 (3d Cir. 1993).  However, where an objection raises Rule 403 and a court fails to record its balancing analysis, we may review the record and need not defer to the trial court.  Ibid.

Before deciding the motions, the district court held a hearing and determined:

> The burden is simply to establish substantial similarity of circumstances, and I think the government has done that here, and I think it's clear the government has done that from my observations of the photographs, from the testimony of the [FBI] Agent, and from the offer of the defense witness.  And I think there's enough similarity and substantial particulars to grant the government's motion . . .

App. at 38.

Though the court did not record an analysis balancing the probative and prejudicial value of the proposed orders, we have reviewed the record and will affirm the orders.  The Waterworks surveillance photographs showed a robber wearing glasses, and photographs taken eight days after the robbery, when defendant was arrested, depicted him with a slight moustache, one the court described as not "comparable" to the one he had at the pre-trial hearing.  App. at 37.  There was also evidence that defendant had worn similar glasses before.  Thus, there was substantial

probative value to having defendant shave and put on glasses. Defendant offered no evidence demonstrating prejudice regarding the order requiring him to shave, and the court informed the jury that the glasses were provided by the government and were not found with defendant. We conclude that the probative value of the twin orders outweighed any prejudice and Rule 403 was not violated.

IV.

For the foregoing reasons, we affirm the judgment of conviction on the Millvale robbery count, vacate the judgment of conviction on the Waterworks robbery count, and remand for a new trial on the Waterworks count consistent with the foregoing decision.

_____

United States v. Joseph Emanuele

No. 94-3283

ROTH, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from that portion of the majority's opinion which reverses the defendant's conviction on

the Waterworks bank robbery count. I do not agree with the majority's review of the evidence of Lorraine Woessner's encounter with the defendant in the courthouse hallway. I am concerned that the majority in its citation of the facts focusses on facts which support its conclusion that the identification of the defendant by Lorraine Woessner was impermissibly suggestive, rather than looking at the whole picture. Such a limited focus does support the majority's ultimate determination that the circumstances of the hallway viewing created a "substantial risk of misidentification." However, I conclude that a broader review of Woessner's voir dire testimony is required and that review supports the conclusion arrived at by the district court.

My reading of the record convinces me that, when the evidence is viewed completely and in context, it will uphold the district judge's decision to permit Lorraine Woessner to identify Emanuele in the courtroom, without holding a prior line-up. Before permitting Woessner to testify or to identify the defendant, the district court had Woessner examined on voir dire concerning the hallway encounter. I will set out Woessner's examination more completely so that its full scope can be appreciated. I begin my discussion with relevant portions of her direct examination:

> Q  At some time did you see someone come out of the courtroom?
>
> A  Yes, we did, um hum.

Q  Could you describe to the Court exactly what happened?

A  Well, we were sitting there and we were, I guess we were waiting to be called in as the witness and three men came out, and we both were kind of startled, and I recognized him right away and, um, didn't say anything. And he was down the hall, and pretty far down the hall when we said to each other, it's him.

Q  So now, if I get this straight, when he first came out of the courtroom did anybody say anything to you prior to your having recognized him?

A  No.

Q  Now, why did you recognize him?  What was your basis for recognizing him?

A  I think it was like his eyes, only it was -- because -- it was his eyes.

Q  Now, at the time -- so, and what were you basing that, that rec-- that recognition on, on your recollection of what occurred on the December 1, 1993?

A  Well, because when it happened, he came in and stood, not behind my customer that I was waiting on, just about two feet onto the side of him and he just -- he had his glasses on and he just starred [sic] at me. I mean, it just like -- I, I mean, I'll never forget it.

Q  How long was he in front of you?

A  I would say -- I was finishing up with my customer. I would say like about three or four minutes.

Q  Now, the government has previously shown to you a series of pictures; correct?

A  Um hum.

Q  And if I could show you what's been marked as Government Exhibits 4 through 9 for purposes of trial, will you look at these for a moment?

Now, you've looked at those previously, right?

A  Um hum.

Q  And you weren't able to identify anybody?

A  Huh ah.[4]

Q  And you still can't?

A  I can identify him, but I mean --

Q  You can't identify him from the picture?

A  Huh ah.

Q  But you can identify the person that you saw in the hallway?

A  Um hum.

App. at 128-130 (emphasis added).

Further information was then developed on the defense's cross-examination of Lorraine Woessner on voir dire:

Q  And from the doors in the courtroom there's like a hallway leading to the hallway where you were sitting? In this hallway, there's a hallway that goes down?

A  Yes.

Q  So, it -- like you were sitting like at the end of a "T" almost, so that you could see the courtroom doors?

A  We could see the courtroom doors.

Q  Okay.  And there's, I don't know, 20 feet or some -- approximately something like that from where you were sitting to the courtroom doors?

A  Yes.

---

[4]I interpret "um hum" as "yes" and "huh ah" as "no."

Q And you and Miss Hottel were talking about what?

A We were just talking about things that we were previously through. We had gone through Integra training and we had gone through that.

Q I see. Now, the courtroom doors open and three men walk out?

A Yes.

Q The gentleman in the middle has his arms behind his back?

A Yes.

Q And he has one man on each side?

A Yes.

Q Did the men on each side have like their hand on his arm or?

A I didn't notice that.

Q Didn't notice that?

A Huh ah.

Q You did notice, though, that the man in the middle had his hands behind his back?

A Yes.

Q And you did notice at some time that he was handcuffed?

A After he was down the hall.

Q You could see when he was going down the hall that he was handcuffed?

A Um hum.

Q   But you knew he was being escorted; he was in the middle from two guys that were escorting him out of the courtroom?

A   Yes.

Q   Did Miss Hottel tell you that was him?

A   Ah, not right away, only when he was down the hall she mentioned that.  I mean, she spoke very softly and said that she, she was very upset because she didn't remember -- she didn't think  she remembered what he looked like, but when she saw him she knew exactly that's who it was.

Q   After the person was taken down the hallway?

A   Yes.

Q   You and Miss Hottel said that it was him.  You turned to each other?

A   No, not really.

Q   No?

A   Huh ah.

Q   Did you discuss the person that came out?

A   No, no.

Q   Didn't say that was him?

A   Huh ah.

Q   She didn't say that was him to you?

A   I think we both looked at each other and we were kind of it's, it has to be him (witness nodding.)

Q   But, it has to be him?

A   Um hum.

Q   Because he was handcuffed or?

A  Well, no, not because he was handcuffed, because from, from his personal appearance.

. . .

Q  After this happened.

Did you discuss with Miss Hottel the eyes?

A  No.

Q  She didn't tell you that?

A  Well, she, she thought it was his eyes, and I, I mean, I agreed with her.

Q  You agreed with her?

A  Right.

Q  But Miss Hottel did mention something about the eyes?

A  Um hum.

Q  Did she bring up the eyes first or did you?

A  I don't really remember that.

Q  The two of you, though, did have a conversation about the eyes on the person that was escorted out of the courtroom?

A  Well, we didn't have a conversation.

Q  You just said it was the eyes?

A  Right.

App. at 133-136.

Based on this voir dire examination of Lorraine Woessner, the district judge decided that she would allow Woessner to testify and would deny the defense motion for a

lineup because the judge found that Woessner had "an independent basis for her identification of the defendant." App. at 138. From my review of this testimony, I do not find this factual determination by the district judge to be clearly erroneous. See United States v. Inigo, 925 F.2d 641, 656 (3d Cir. 1991) (district court's refusal to suppress documents reviewed for clear error as to the underlying facts).

In reviewing such a factual determination by the district court, we do not have to agree with the conclusion arrived at by the district judge (although I am prepared to do so). We must instead determine whether the district judge's conclusion is supported by the evidence. See e.g. Cooper v. Tard, 855 F.2d 125, 126 (3d cir. 1988) (for clear error "our standard of review is whether there is sufficient evidence in the record to support [the district court's] findings). Clearly here there is sufficient evidence. Lorraine Woessner testified that she recognized the defendant "right away" as he came out of the courtroom -- before he passed her so that she could see the handcuffs and before Martha Hottel said anything about his identity. The district judge was present to hear the testimony and to weigh credibility. I find it inappropriate for us to completely disregard the judge's credibility determination -- as, it would seem, we must if we do not accept Lorraine Woessner's

testimony that she recognized the defendant "right away" as he emerged from the courtroom.[5]

In view of the credence which the district judge had to give to Lorraine Woessner's statement that she recognized Emanuele "right away,"[6] what weight must I give to the fact that, after Emanuele had walked past her, Woessner could see that his hands were cuffed behind him?  In view of the immediate recognition, I do not find Woessner's subsequent observation of the handcuffs to be unduly suggestive -- just as the majority does not find unduly suggestive the fact that Martha Hottel saw the handcuffs also.

This then brings me to the issue of the propriety of the standard followed by the district court:  Was there "an independent basis" for the identification; i.e., is Woessner's immediate recognition of Emanuele, a sufficient ground to support the denial of the defense's motion for a lineup.  I conclude that "an independent basis" for an identification is consistent with an identification which possesses sufficient aspects of reliability; that Woessner's testimony of immediate recognition of the defendant eliminates the "substantial risk of

---

[5]As the majority acknowledges, because there was no apparent government complicity in the way in which the confrontation came about, I do not have to factor the element of evil government intent into my consideration.

[6]The district judge could not have arrived at the decision she did if she had not believed Woessner on this point.

misidentification" which could be engendered by such an encounter. If Woessner recognized Emanuele immediately in the corridor, I easily infer that she would have recognized him immediately in the courtroom had the corridor encounter not occurred. Lorraine Woessner testified on voir dire that, at the bank, she observed the defendant for three or four minutes as he stood about two feet from the side of the customer she was waiting on; that she recognized the defendant immediately when he came out of the courtroom, before she could see his hands cuffed behind him; that she recognized him in the hallway from his eyes; and that the photograph of defendant, which she could not identify as the defendant when it was shown to her by the F.B.I., she again in the courtroom, after the hallway encounter, could not identify as the defendant.

For all the above reasons, I believe that the district court did not err when it permitted Lorraine Woessner to make a courtroom identification of the defendant. I am, therefore, of the opinion that defendant's conviction on the Waterworks bank robbery count should be affirmed.[7]

_____

[7]Because I would affirm the district court's admission of Woessner's in-court identification of the defendant, I do not need to go on to harmless error. However, were that necessary, I would find any error to be harmless. The surveillance photos, taken at the Waterworks bank, are independent corroboration of defendant's involvement. They were identified, as being of defendant, by a disinterested witness, who had recently repaired Emanuele's car for him, and by a woman who had given him a temporary place to stay. The "interest" of the witnesses, such as defendant's mother and his girl friend, who could not identify

the bank photos, was made evident to the jurors, who also saw the photos.

Moreover, defendant's "expert witness," the plastic surgeon who testified from a comparison of photographs that the bank photos were not of Emanuele, admitted that he knew little about photography. The photographs he compared with the bank photos were taken with a different camera and different film; the image was captured at a different location on the surface of the camera lens, while Emanuele was standing still. App. at 444-46. As the prosecution's photography expert testified, the slow film and poor lens in the bank camera could "smear" a moving figure on the film so that the image was distorted. App. at 465-67. In addition, the defense expert made his measurements from points, such as the eyebrows, which may move according to the subject's expression, e.g., a frown or a smile. I raise my own eyebrows at this type of expertise.