FILED
COURT OF APPEALS DIV I

2015 AUG 10 A.. 8: 49



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70253-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORLEN GURZELLE DARDEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 10, 2015 |
| | ) | |

TRICKEY, J. — A defendant is not unduly prejudiced by a witness who merely observes a defendant going to and coming from the courtroom in shackles accompanied by correction officers. Here, there was independent indicia of reliability of the witnesses' identification, and there is no evidence in the record of which witnesses, if any, observed the defendant coming and going to the courtroom. Accordingly, the trial court's denial of the defendant's motion for a new trial was proper.

## FACTS

Around midnight on July 28, 2012, as Lauren Acheson and her husband Christopher Tanghe were walking to their home in Capitol Hill, two men approached them from either side, boxing them in. Lamar Travis, the shorter man, pulled out a semiautomatic handgun, chambered a round, and pointed it in Tanghe's face. Travis told the couple it was "for real" and not to make this a homicide.[1] Approaching

---

[1] Report of Proceedings (Mar. 6, 2013) at 7.

pedestrians caused the robbers to flee with Tanghe's laptop and Acheson's purse. Tanghe called 911.

Later that same evening in West Seattle, the same two men robbed Lynn Matthysse and Allison Fulton. Matthysse, wanting to keep her camera, argued with the man who took her backpack and purse. That man was later identified as Orlen Darden. Andrew Masters, a neighbor out walking his dog, happened on the scene and interrupted the robbery. The robbers fled with Fulton's and Matthysse's purses. Matthysse and the neighbor chased the men and observed one of them getting into the passenger side of a car. They managed to get the license plate number of that vehicle.

The police discovered the registered owner was Travis's mother, Nikola Travis. A police officer drove by the residence and saw the car. Travis was seen shutting the trunk and walking towards his residence with a computer bag on his shoulder. Nikola, hearing her car, came out to confront Travis because she was angry that Travis had kept the car so late.

Nikola gave the police permission to search the car. The officers found various items belonging to Acheson, Matthysse, and Fulton on Travis. Tanghe's laptop was in the shoulder bag. Police also located a pistol in the trunk of the Buick. The police arrested Travis and impounded the vehicle. In a showup, neither Matthysse nor Fulton could identify Travis.

After Travis was arrested, Nikola called Darden several times. The first time, Nikola told Darden that she knew Darden was with Travis and that Darden needed to speak with her. Darden said he would come, but then did not. Shortly after that phone

2

call, Darden called the public number for the King County jail, a call that lasted for 10 minutes.

Approximately a week after the robberies, Darden met Nikola. When Nikola asked Darden what had happened and why he and Travis had used her car to commit the robberies, Darden started crying and apologized, saying that it was all Travis's idea. Darden also told her that it was just a matter of time before he was caught because his fingerprints were in the car.

The police had lifted a latent fingerprint from the outside passenger door of the car that was later identified as belonging to Darden. Three weeks later, Detective David Clement arrested Darden. Darden told Clement that he had not spoken with Travis since May or early June, that he had never ridden in a car with Travis, and that Travis did not own a car. When informed that the police had discovered his fingerprint on the car, Darden explained the presence of his fingerprint from his having had his hair braided by Travis's mother, Nikola, and that he had last seen her in June. Nikola testified that she had never seen Darden near her car and that she had not braided his hair.

The State charged Darden and Travis with two counts of robbery in the first degree, each with a firearm. Travis pleaded guilty to both robberies. Before trial, Darden moved in limine to exclude the witnesses' out-of-court and in-court identifications. The trial court denied the motion in limine, and the matter proceeded to trial.

Before the last victim witness, Tanghe, testified, Darden moved for a new trial based on allegations that the witnesses' in-court identifications were tainted by

observing Darden coming to court in shackles surrounded by officers. That morning, before Darden moved for a new trial, Matthysse, Fulton, and the neighbor had all testified. The previous day, Acheson had testified. However, the last victim witness, Tanghe, had not yet testified. The court denied his motion, but in an abundance of caution, required that Tanghe be separated when Darden came to court.

Matthysse picked Darden from a photomontage that was e-mailed to her. She assigned a 65 percent confidence rate to her choice. In court, Matthysse identified Darden as the man who robbed her, but was still unable to say it with 100 percent certainty.

The neighbor who had helped obtain the license plate was not able to identify Darden either in court or from a photo array.

Fulton could not identify Darden in the photomontage. In court, however, she identified Darden with a 95 percent certainty.

The day before, Acheson testified that the robber who was in front of her was larger, taller, and broader than Travis, the one closest to Tanghe. Both were African American with darker complexions. Several days later, at police headquarters, Acheson identified Darden from a photomontage. She evaluated her choice as being 70 percent accurate. However, when she returned home, she e-mailed the detective stating she would ratchet down her certainty to 30 or 40 percent. In court, Acheson identified Darden with 80 percent confidence.

Tanghe, Acheson's husband, could not identify anyone from the photomontage. Similarly, Tanghe did not select anyone in a police lineup, although he thought one person was similar to the person who held the gun on him. Tanghe was not able to

identify Darden in court, but testified that there were similarities between Darden and the person who robbed him.

Defense proffered testimony that Darden was at a birthday celebration that evening and had not left the house. The State refuted the alibi with phone calls made from Darden's phone to those with whom he was alleged to be with that evening, including his mother and sister. Twelve phone calls were made to parties who said Darden was with them in the same house.

The jury convicted Darden on both counts. He appeals the trial court's denial of his motion for new trial. Darden does not appeal the motion in limine denying his motion to exclude both the out-of-court and in-court identifications made by the witnesses.

## ANALYSIS

The State first argues that the motion for a new trial was untimely and that this court should refuse to review the matter. But timeliness of the objection is not an issue in this case because the trial court was sufficiently apprised of the matter in the motion for mistrial. See Egede-Nissen v. Crystal Mountain, Inc., 93 Wn.2d 127, 606 P.2d 1214 (1980).

Darden contends the trial court abused its discretion in denying his motion for a new trial after eyewitnesses saw Darden in shackles outside the courtroom and then identified Darden in court as the perpetrator. Darden argues that this was an impermissibly suggestive procedure which deprived him of a fair trial. The court denied the motion, but gave defense an opportunity to find case law supporting its theory that a witness observing a defendant in shackles is unduly prejudicial. Darden did not find any

case law to support his proposition, but continued to argue that the witnesses' in-court identifications after observing the defendant in handcuffs in the hallway were prejudicial and should be excluded under ER 403.

We review a court's decision to deny a motion for a new trial for an abuse of discretion. State v. Copeland, 130 Wn.2d 244, 294, 922 P.2d 1304 (1996). We reverse a trial court's exercise of discretion only if it "'is manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Magers, 164 Wn.2d 174, 181, 289 P.3d 126 (2008) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

In determining whether an out-of-court identification is impermissibly suggestive such that it becomes substantially likely that irreparable misidentification will occur, the court employs a two-part test. State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). The defendant must first show that the identification procedure was impermissibly suggestive. Vickers, 148 Wn.2d at 118. If the defendant fails to make that showing, that is the end of the inquiry. Vickers, 148 Wn.2d at 118. If the defendant meets this burden, then the court determines whether the identification contained sufficient indicia of reliability despite the suggestiveness. State v. Ramires, 109 Wn. App. 749, 761, 37 P.3d 343 (2002).

However, even where an impermissible procedure is used, suppression of the resulting identification is not the inevitable result. Perry v. New Hampshire, ___ U.S. ___, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012) (citing Neil v. Biggers, 409 U.S. 188, 201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)). In deciding whether there was substantial likelihood of misidentification, the court considers the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's

degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Biggers, 409 U.S. at 199-200. The due process test for suppression of an in-court identification allegedly tainted by an impermissibly suggestive out-of-court identification is whether that out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification. See also Manson v. Brathwaite, 432 U.S. 98, 106, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) ("admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability").

In State v. Birch, 151 Wn. App 504, 515, 213 P.3d 63 (2009), Division Three of this court has already held that a witness who observes a defendant escorted by law officers while that defendant is in handcuffs is insufficient in and of itself to taint an in-court identification where no other impermissible suggestiveness existed. There, the witness gave a description similar to that of the defendant, she was only three feet away from the defendant at the time of the crime, and she had seen him for a "good few seconds." Birch, 151 Wn. App. at 515.

Similarly here, there is no other impermissible suggestiveness. The victim witnesses were all in close proximity to Darden during the course of the crime, the descriptions given were similar to those of Darden, and his fingerprint was found on the vehicle in which several items of the victims were discovered. We decline to accept Darden's invitation to find that Birch was wrongly decided.

7

Furthermore, the cases that Darden cites in support of his claim involve facts that are distinguishable and much more extreme than those in this case. For example, Darden cites United States v. Emanuele, 51 F.3d 1123 (3rd Cir. 1995). There, the defendant was convicted of robbing two banks. When first shown a photo array, one of the tellers identified the defendant, but was not 100 percent certain. Five weeks later, shown another photo array, the first teller selected someone other than the defendant. The second teller was unable to identify the defendant when shown a photo array shortly after the robbery at the second bank. While waiting to testify, the two bank tellers observed the defendant being led out of the courtroom in manacles. One of the tellers remarked that "it has to be him." Emanuele, 51 F.3d at 1126. The trial court denied the motion to suppress the anticipated in-court identifications by the tellers. After trial, defense moved for a new trial, which was also denied.

In a split decision, the Emanuele court determined that the first teller's initial identification, although not 100 percent certain that the defendant was the robber, was not diminished by her subsequent viewings. Thus, admission of the first teller's testimony was not an abuse of discretion. Emanuele, 51 F.3d at 1131. But because the second teller was not able to identify him in a photo array and viewed the defendant in conditions "reeking of criminality," together with the reaction of "it has to be him," rendered the identification unreliable and constituted constitutional error. Emanuele, 51 F.3d at 1131. The court reversed the conviction for the second robbery in which the bank teller was unable to identify the robber from a photo array, holding that the error was not harmless. Emanuele, 51 F.3d at 1132.

Emanuele does not help. First, Darden does not identify the witnesses who he claims saw him in handcuffs outside the courtroom, or how this may have deprived him of a fair trial. Further, unlike Emanuele, nothing in the record here suggests that any of the witnesses' in-court identifications were based on anything other than their observations at the time of the crimes. Nor was there any inquiry by counsel about the details of the view and what role, if any, it may have played in the testimony.

Nor is Darden's reliance on United States v. Russell, 532 F.2d 1063 (6th Cir. 1976) particularly helpful. In Russell, the defendant, convicted of bank robbery, was identified by three witnesses. The first witness selected a photograph from a montage. After her selection, the FBI agent told her that this was "the guy we think probably did it." Russell, 532 F.2d at 1067. The second witness also made a photographic identification. However, she narrowed it down to two choices and finally chose the correct one. The agent informed her that the one she had chosen was the wrong one and that the other photograph was the guilty person. The third witness was unable to make an identification from the photographic array, but identified the defendant only after observing him in manacles just before the preliminary hearing.

Russell is inapplicable because here, the witnesses were closer to the suspect, saw more than a profile of him, and were able to view him over the course of the crime. Further, there were no additional facts which tainted the witnesses' identification.

This case is more like Biggers than Emanuele. Although some of the circumstances here weaken the reliability of the eyewitnesses' identification—the generality of their descriptions of Darden, the relatively short period of time they saw him, and the other shortcomings pertaining to their identification—those factors go to

the weight of the evidence rather than the reliability of the identifications, and thus, it is an issue for the jury. See United States v. Davis, 487 F.2d 112, 122 (5th Cir. 1973) (finding "insubstantial" the defendants' argument that victims' in court identification was tainted because witness observed accused in custody outside courtroom).

Because there was no other evidence of impermissible suggestiveness, the trial court did not abuse its discretion in denying Darden's motion for a new trial.

Affirmed.

_Trickey, J_

WE CONCUR:

_Dwyer, J_

_Spearman, C.J._