# GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

## v.

## PATRICK RILEY, Appellant

No. 91-3511

United States Court of Appeals

for the Third Circuit

August 25, 1992

Thurston T. McKelvin, Esq. (Argued) (Federal Public Defender), St. Thomas, V.I., *for appellant*

Terry M. Halpern, United States Attorney; James R. Fitzner (Argued), Assistant U.S. Attorney, Christiansted, St. Croix, V.I., *for appellee*

BEFORE: SLOVITER, *Chief Judge*, MANSMANN and WEIS, *Circuit Judges*

## OPINION OF THE COURT

MANSMANN, *Circuit Judge*

In this appeal we are faced with the question of whether the defendant's right to a fair trial was violated on retrial due to the publicity surrounding his first trial which had ended in a hung jury. Prior to retrial, Acting Chief Judge Brotman (who did not preside over the first trial) conducted voir dire of the venirepersons in his chambers and ascertained that each person who ultimately sat on the jury had an open mind and would determine the defendant's guilt or innocence based solely on the evidence introduced at trial. We concur with the district court that Riley has not demonstrated substantial prejudice arising from the publicity. Further, we conclude that the district court did not abuse its discretion by admitting into evidence the videotape deposition testimony of a minor child eyewitness. Consequently, we will affirm the judgment of the district court.

I.

Patrick Riley's first trial made headlines because the district judge, a senior visiting judge from another circuit, chastised the jury after it became apparent that two hold-outs would not be able

to reach a verdict.[1] The district judge's comments produced a backlash of animosity from local officials and brought arguments from commentators, both pro and con. The facts underlying the trial were more simple, and yet more tragic.

On August 27, 1990, Samuel "Bing" Joseph was shot to death. The crime was witnessed by his three-year old son, Jamiel. Approximately two hours after Joseph's body was discovered, the Virgin Islands police apprehended Patrick Riley and brought him in for questioning. While Riley was waiting in an interrogation room in front of a one-way mirror, Jamiel Joseph was brought into the adjoining room by his mother and a detective where Jamiel could observe Riley without his presence being known. The detective asked Jamiel to tell him if he recognized the person in the room.[2] Jamiel looked at Riley, cried out and ran from his mother. He tried to hide under the mirror.

---

[1] The Judge stated, inter alia:

> If you—if there had been any adherence to your oath, there is no reason or conscience, conviction that to reach a conclusion that this man is not guilty. If there is any doubt about it, that child's reaction when he saw this man on the day that this happened on the day of the incident would be sufficient to remove all doubt that this is the man—as a matter of fact was guilty of this murder.
>
> . . .And I am going to make a formal request of the United States Attorney's office that the jurors in this case, the two jurors be investigated with a view that if it's determined that they have any connections with the family or with this man, that they be—that the matter is brought against him in terms of being prosecuted for obstruction of justice.
>
> . . . One would think that in this community where blacks are in the majority, that this—there would be some concern about this [black men killing black men] and that you would send a message when you had an opportunity, that this is not going to happen. We are going to do something about it.
>
> . . . .
>
> I think there is something desperately wrong with that, and I think that the two who have been—who have held out with the conviction of this are culprits and I believe that in my judgment that they should be investigated. . . . That's the end of it. I am not going to have anything more to do with this.
>
> As a concerned citizen, I am taking this opportunity to tell you just how craven and criminal that I regard your conduct. You may be dismissed.
>
> App. at 34-36.

[2] There is some dispute as to whether the detective asked Jamiel if he recognized the man in the next room or if the boy just saw Riley after the detective tapped on the glass to get Riley to look up. Jamiel became very agitated, ran from the room and begged to he taken home.

431

That afternoon the detective and his partner went to the boy's home where they showed him a photo array consisting of six photographs. The array included a photo of Riley and five other men who resembled Riley The detectives requested that Jamiel pick out the man that "shot his Daddy." Jamiel identified Patrick Riley. The detectives rearranged the photos and asked him to pick out the man once again. Jamiel chose Patrick Riley's photo a second time. A second photo array identification by Jamiel was videotaped several months later. Although Riley waived his right to be present at the deposition, his counsel cross-examined Jamiel.

Riley, through his defense counsel, moved to suppress the evidence of the photo display, contending that it was tainted by the suggestive confrontation which took place earlier. The district court denied the motion after conducting a hearing where the police detective testified to the conduct of the identification procedure. A videotape of the identification was played to the jury at the trial.[3] Riley renewed his objection to the use of the evidence before the second trial and his motion was once again denied. The district court[4] determined that the denial of the motion was the law of the case and the evidence was admissible.

The second trial was scheduled to start approximately five months alter the first ended in a mistrial. Eighty-seven people made up the venire for the second Riley trial. Of those, nineteen were dismissed due to familiarity with the parties or relationship to police officers or for personal reasons. Of the remaining sixty-eight, all but sixteen admitted to having heard or read about the previous trial. The district court interviewed, in his chambers, all of the jurors admitting familiarity with the case.[5] He asked each venireperson individually what the source of publicity was, whether the person had already made a decision on the merits of the case and whether, if chosen to serve, the venireperson would keep an open mind and reach a decision based solely on the evi-

---

[3] Jamiel testified that he was in the front seat of the car beside his father when a man approached the car. Jamiel saw the man shoot his father, get in his car and drive away up the hill. Supp. App. at 20–29.

[4] As previously noted, the district judge on the retrial was not the same judge who presided over the first trial.

[5] One juror was aware that approximately half a million dollars in jewelry from a highly publicized theft had been found in the defendant's house. The juror nonetheless expressed his ability to keep an open mind.

dence introduced at trial.[6] During this process, counsel for Riley did not object to any of the venirepersons for cause.

Finally, twelve jurors and four alternates were chosen. After several days of trial the jury returned a guilty verdict. This appeal followed.

We analyze the defendant's claims of lack of an impartial jury by conducting an independent review of the voir dire of the empaneled jurors to determine whether the Riley has demonstrated that "substantial prejudice" arose from the publicity. United States v. Gilsenan, 949 F. 2d 90, 95 (3d Cir. 1991), cert. denied, 112 S.Ct. 2971 (1992); United States v. Provenzano, 620 F.2d 985, 996 (3d Cir. 1980); United States v. D'Andrea, 495 F.2d 1170, 1172 (3d Cir.), cert. denied, 419 U.S. 855 (1974). We review the district court's admission of the minor's identification of the defendant for an abuse of discretion.

## II.

Riley's first contention on appeal is that he was denied a fair trial because the publicity surrounding the first trial and the trial judge's comments to the deadlocked jury deprived him of an impartial jury for the second trial.

■■ It is axiomatic that one of the fundamental rights a defendant possesses is the right to a fair trial before an impartial. "indifferent" jury of his peers. Murphy v. Florida, 421 U.S. 794, 799 (1975). Thus, a defendant's conviction may be overturned if the trial atmosphere was so pervaded by publicity that no jury could be empaneled which did not have a preconceived determination of guilt. E.g, Irvin v. Dowd, 366 U.S. 717 (1961) (string of murders

---

[6] An example of the district court's questioning is as follows:

> You indicated in response to my question that you had heard or read something about this case. . . .could you tell me what you have heard?. . . Do you recall anything more specific than what you just mentioned to me? . . . Would the information that you hear, received or read about from the sources you have just mentioned, would that information in any way affect your impartiality in this case? . . . Have you made a determination in this case?. . . Can you enter on this jury with an open mind? . . . Can you then decide this case fairly and impartially and based solely upon the testimony and evidence produced in this courtroom? . . .

> The voir dire occurred in the district court's chambers with the defendant and his counsel present. The defense counsel did not object to any of the questions asked of the potential jurors.

were extensively covered by the news media and after petitioner's arrest police officials issued press release of petitioner's confession); Sheppard v. Maxwell, 384 U.S. 333 (1966).

Riley argues that the publicity surrounding the first trial judge's improper comments to the jury, including the judge's statements that the defendant was guilty, were so inflammatory that he could not get a fair and impartial retrial. Furthermore, he contends, there were no jurors on the island who could render a fair and impartial verdict. We disagree.

■ We note that most of the jurors were aware that there had been a previous trial which ended in a mistrial. Nonetheless, if this knowledge did not color their judgment or cause them to have a preconceived notion of the defendant's guilt, that knowledge alone is insufficient to deprive Riley of a fair trial by an impartial and "indifferent" jury.

The Supreme Court has made it clear that the "relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S 1025, 1035 (1984). Yount involved a well-publicized murder case where the victim was an eighteen-year-old high school student and the defendant, Yount, was the high school mathematics teacher. Yount's first trial ended in a conviction which was later overturned when the Pennsylvania Supreme Court determined that his *Miranda* rights had been violated when the police obtained a confession without allowing Yount to consult with his attorney. The publicity prior to retrial revealed Yount's previous confession to the murder and his plea of temporary insanity, none of which was admissible evidence at the second trial. Yount argued to the United States Supreme Court that the pretrial publicity deprived him of a fair trial. The Supreme Court upheld the conviction, concluding that "the *voir dire* testimony and the record of publicity do not reveal the kind of 'wave of public passion' that would have made a fair trial unlikely by the jury that was empaneled as a whole." Yount, 467 U.S. at 1040.

We have held that "[p]retrial publicity exposure will not automatically taint a juror." United States v. Provenzano, 620 F.2d 985, 995 (3d Cir. 1980). Thus, "[e]ven if the juror has heard of or about the case and of the allegations of a defendant's guilt, he may sit if he is still capable of abandoning his prior impressions and rendering a fair verdict on the evidence." 620 F.2d at 995.

434

The publicity in Provenzano involved newspaper accounts which utilized terms such as "Mafia," "gangster," and "organized crime," but none of the potential jurors gave any credence to the generic inferences. 620 F.2d at 996. Here, the statements made by the first trial judge after declaring a mistrial were more specific, but it was equally clear from the record of the voir dire that none of the venirepersons gave it any weight.

Moreover, we note from our reading of the trial transcript that Judge Brotman instructed the jury on retrial, prior to the opening arguments, that the defendant was presumed innocent until the government was able to prove his guilt beyond a reasonable doubt. Trial trans. July 16, 1991, at 70-72. Additionally, the district court cautioned the jury that they were to determine the verdict based only on the evidence placed before them during the trial and they were not to investigate or discuss the case, nor read about it or listen to news reports of the case.[7] Trial trans. July 16, 1991 at 73-74. The judge repeated the caution at the end of each trial day. Trial trans. July 16, 1991, at 197, July 17, 1991 at 171-72.

■ We find Riley's argument that he could not have received a fair trial by an impartial jury to be without merit in light of the extensive voir dire conducted by the second trial judge. After reviewing the transcripts of the voir dire, we are convinced that the jurors who were finally empaneled had not already determined the defendant's guilt, but rather, maintained an open mind and ultimately determined Riley's guilt based on the evidence placed before them at trial. Consequently, the record does not support a finding of substantial prejudice necessary for relief under Provenzano and D'Andrea.

### III.

Riley's other contention on appeal is that the admission into evidence of the identification of the defendant by the victim's son, Jamiel Joseph, as the man who shot his father was a violation of his right to due process. Riley argues that Jamiel's identification was impermissibly suggestive and tainted.

---

[7] One juror came forward on the second day of the trial and told the district judge's courtroom assistant that she had had a conversation with a friend of the victim who blurted out that he hoped she would do the right thing as a juror. The juror was excused and replaced by an alternate.

The district court conducted a hearing on Riley's motion to suppress and concluded that the identification process had not been unduly suggestive.[8] The district court concluded that no one had made suggestive comments to Jamiel nor was Riley's photo manifestly different from the others in the array. As for the identification of Riley by Jamiel on the opposite side of the one-way mirror, the district court stated: "That seems to me one of the most reliable of recognition that there is." App. at 27.

■ To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification. Neil v. Biggers, 409 U.S. 188 (1972). The question of whether the suggestiveness created a substantial likelihood of misidentification is to be considered:

> with reference to the "totality of the circumstances," with particular attention paid to such relevant factors as the quality of the witnesses' original opportunity to view the criminal, their degree of attention, their level of certainty when confronted with the subject or his image, and the length of time between the crime and the confrontation.

United States v. Dowling, 855 F.2d 114, 117 (3d Cir. 1988), citing Neil, 409 U.S. at 199–200.

Applying these factors to this case, we discern that the crime occurred at approximately 10:00 a.m., during the daylight hours. Jamiel had an opportunity to watch Riley approach his father's car, saw his father get out of his car and observed Riley shoot his father and then drive away. This provided Jamiel with ample opportunity to form an impression of Riley's appearance. Jamiel recognized Riley a few hours later at the police station behind the one-way mirror. The confrontation occurred around 1:30 p.m., a mere three-

---

[8] The determination was made by the district judge who presided at Riley's first trial. The second district judge hearing the motion before Riley's retrial determined that he was bound to follow the denial of the motion to suppress as the law of the case. Without commenting on the correctness of the use of the law of the case doctrine, in order to determine that a manifest injustice has not occurred, we must review the decision of the first district judge. See Hayman Cash Register Co. v. Sarokin, 669 F.2d 162 (3d Cir. 1982); Sanders v. Sullivan, 900 F.2d 601 (2d Cir. 1990) (under the law of the case doctrine, court adheres to its own decision at earlier stage of litigation unless there are compelling reasons not to, such as an intervening change in the law, newly discovered evidence or the need to correct clear error or prevent a manifest injustice).

and-a-half hours later. The first photo array occurred at Jamiel's home around 5:00 p.m. that afternoon, less than eight hours after the crime occurred. The videotape deposition of Jamiel's identification by photo array occurred eighty-three days after the commission of the crime. In addition, Jamiel's identification of Riley was unshakable. When the police officers rearranged the photos of the array during the identification by Jamiel at his home, Jamiel still picked out Riley.

■ Having reviewed the record of the suppression hearing and the deposition of the minor witness, Jamiel, based on the totality of the circumstances test of Neil and Dowling, we hold that the identification process was neither suggestive nor apt to produce a misidentification. Therefore we conclude that the district court did not abuse its discretion by admitting into evidence Jamiel's identification of Riley as the man who shot his father.

While Riley suggests that his conviction occurred solely due to the testimony of the minor witness, the trial record does not support his assertion. The videotape deposition of Jamiel Joseph identifying Riley was only one link in the chain of evidence presented by the government in its case against Riley. We will recount some of this evidence as we adduced it from the trial transcript.

Calvert Charleswell testified that on Sunday, August 26, 1990, at around 6:30 p.m., he was a passenger in a car driven by Samuel "Bing" Joseph. The two were at Brewer's Beach when Bing spotted Patrick Riley's car and motioned for Riley to come over. Riley approached the car and Bing asked Riley why he had hung up the phone on him. Riley became animated and angry and the two men exchanged heated words. The argument concerned Valecia Patrick, a woman who was dating both men. Trial trans. July 17, 1991, at 37–41.

Emanuel De Foe testified that De Foe's niece, Candido Charles, had been married to Bing Joseph and Bing was often at his house visiting Jamiel, his son. Patrick Riley called De Foe's house on Sunday evening, August 26, asking if Bing Joseph was there. When De Foe answered that he was not, Riley left the message that Bing was to meet him at 6:00 a.m. in town. De Foe relayed the message to Candido but not to Bing. Trial trans. July 17, 1991, at 33–35.

Clyde Richardson testified that around 9:00 p.m. on Sunday, August 26, 1990, Patrick Riley came to his home and asked to borrow a gun. Richardson produced a .357 magnum which he had pur-

chased several years prior from Riley for $350.00. When Richardson asked Riley why he needed the gun, Riley told him that he was going to show the gun because someone was interested in buying it. Riley checked the cylinder of the gun, found that it had two empty chambers and requested more bullets from Richardson. Richardson gave Riley two more rounds so that all chambers were filled. Trial trans. July 16, 1991, at 89–91.

Richardson further testified that the bullets in the gun were .38 caliber, but of different construction. Some of the bullets were hollow point, some were short, flat bullets used for target practice, and some were standard solid rounds. Trial trans. July 16, 1991, at 91–92.

Jeffrey Turbe testified that on the morning of August 27, he and his friend were in a fishing boat approximately 200 to 300 yards off the shore of Brewer's Beach when he heard a series of five or six shots. He saw a black man wearing a white shirt standing in the grass looking down at something. Turbe stated that he heard the man say something but all he could understand was "got you". Then he saw the man get in a maroon or dark red car and drive away in a hurry. Trial trans. July 16, 1991, at 106–108.

Patrick Riley's neighbor, Alfred Medura, testified that Riley drove a red Mazda 626 and on the morning of August 27, the day of the shooting, he had returned to his home around 11:00 a.m. driving at a high rate of speed. Medura stated that Riley did not usually drive at that speed. Trial trans. July 17, 1991, at 51–54.

Doctor Joseph Garceau, a forensic pathologist at St. Thomas Hospital, testified that he identified five separate injuries resulting from gunshots to Bing Joseph. Of these injuries, three were non-fatal injuries: one graze injury to the left shoulder, a penetrating injury to the left shoulder, and entry and exit wounds in the right arm. Two of the bullet wounds were fatal: one where the bullet entered the back and pierced the lungs and another which entered from the back, pierced the lungs and the heart. Dr. Garceau explained that the bullet which pierced the heart was fired by someone standing over the victim and firing in a downward direction. Trial trans. July 16, 1991, at 171–81.

Dr. Garceau removed three bullets from the body of Bing Joseph and gave them to the forensic team of the St. Thomas Police Department. These, along with the bullets recovered from the scene of the shooting, were sent to the F.B.I. laboratory in Washington, D.C. for examination. Trial trans. July 16, 1991, 167–69, 180, 145.

Gerald Wilkes from the F.B.I. Washington lab testified that the bullets he received from the St. Thomas Police were probably all fired from the same gun due to the markings on the rounds which occurred when the bullets were fired. Moreover, he testified that some of the bullets were hollow point, some standard and some were wad cutters, i.e., bullets with flattened heads. Trial trans. July 16, 1991, at 184–189.

Agent John Riley of the F.B.I. testified to the results of the gunpowder test taken by Officer George of the St. Thomas Police Department. The test required the examiner to swab the suspect on the palms and on the backs of both hands. The swabs are then tested for traces of antimony and barium, two products of expelled gunpowder. Based on the amount of antimony and barium found on the swab taken from the palm of Riley's left hand, the agent concluded that Riley had fired a gun or had handled a gun which had recently been fired.[9] Trial trans. July 17, 1991, at 65–68.

■ We have not recapped all the evidence presented by the government. However, that which we noted demonstrates that the government had both the scientific and circumstantial evidence from which the jury could have convicted Riley for the murder of Bing Joseph. Thus the conviction did not hinge on the testimony of a four-year-old child.

## IV.

For the above stated reasons, we will affirm the judgment of the district court.

---

[9] At the time Officer George performed the test on Riley, he claimed to be right-handed. However, F.B.I. Agent Luis Rivera testified that he had the opportunity to observe Riley when he was writing and noticed that Riley was using his left hand.