**Raymond VAZQUEZ**

v.

**Frank A. ROSSNAGLE**

**No. CIV. A. 00–CV–283.**

United States District Court,
E.D. Pennsylvania.

Feb. 16, 2001.

Richard J. Orloski, Orloski & Hinga, Allentown, PA, for Raymond Vazquez, Plaintiff.

Platte B. Moring, III, White and Williams, Allentown, PA, for Frank A. Rossnagle, Defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

### I. Introduction

On January 14, 2000, the plaintiff, Raymond Vazquez, instituted a two-count complaint seeking monetary damages for violation of his civil rights pursuant to 42 U.S.C. § 1983 and for false arrest and false imprisonment under state law. In his complaint, plaintiff alleges that he was wrongfully arrested and detained by the defendant, Officer Frank Rossnagle, on May 5, 1999 for allegedly participating in a shootout in the City of Bethlehem, Pennsylvania. More specifically, Vazquez's complaint alleges that the defendant did not have probable cause for his arrest, because the defendant relied on an unreliable eyewitness identification, arrested the plaintiff solely because he was Hispanic, and refused to administer a gunpowder residue test to the plaintiff. In plaintiff's response to defendant's motion for summary judgment, plaintiff additionally alleges that the defendant disregarded exculpatory evidence and manufactured a confession. The Court holds that the defendant had probable cause to arrest Raymond Vazquez, and the Court, therefore, grants defendant Rossnagle's motion for summary judgment on both the constitutional and state law claims.

### II. Undisputed Facts

On May 5, 1999, the Bethlehem Police Communications Center received a number of 911 calls reporting a shootout in the Five Points Area of Bethlehem. Defendant Rossnagle responded to the dispatch. Upon arrival at a local convenience store near the alleged scene of the shootout, Rossnagle was approached by Robert Irby, who identified himself as one of the 911 callers. Irby then provided Rossnagle with a description of the shooters. He stated that all four were Hispanic males and that one of the four was in his twenties, was wearing a yellow shirt, and had run South on Broadway Street in the direction of the Bavarian Tavern. Rossnagle put the information about the fourth individual out over the radio. (Pl.Ex. 3, 13–19). Officer Israel then located Vazquez, a Hispanic male in his twenties, wearing a yellow shirt, in the vicinity of the Bavarian Tavern.[1] (Def.Ex. F, 34). Officer Israel noted that Vazquez was wearing a navy blue New York Yankees cap and radioed back to Rossnagle to inquire whether Irby recalled the suspect wearing a baseball cap. Irby confirmed that the suspect had been wearing a baseball cap, but could not recall the color. (Def.Ex. D, 84). Officers Israel and Strawn questioned Vazquez and a friend, Adrian Solis, with whom Vazquez claimed to have been shopping prior to being detained. (Def.Ex. G, 103–104). Neither Vazquez nor Solis mentioned having witnessed a shootout during this initial questioning. (Def. Ex. G, 104–105; Def. Ex. H, 83; Def. Ex. R, 13–14).

Officer Israel then asked Rossnagle to drive Irby to the area where Vazquez was being detained in order to have Irby make an identification. (Def.Ex. D, 24–25). Irby identified Vazquez as the shooter. (Def.Ex. D, 27–28). Vazquez was placed in handcuffs and taken to police headquarters. Rossnagle continued to conduct an investigation of the area, finding shall cas-

---

1. There is some disagreement between the parties as to whether Irby identified the suspect as wearing a yellow shirt or a yellow tank top. This discrepancy will be discussed later.

ings and bullet fragments at the scene of the shootout. (Def.Ex. D, 31–33).

Plaintiff executed a Miranda waiver at the police station and was subsequently interviewed by Officers Rossnagle and Reszek. (Def.Ex. D, 47). During this interview, the plaintiff admitted to witnessing the shootout. Defendant Rossnagle claims that Vazquez used the phrase "we were shooting" twice during the interview. (Def.Ex. D, 48–49). Vazquez denies ever using that phrase. (Def.Ex. G, 130). Following the interview, Vazquez was brought before a magistrate judge for a preliminary arraignment. (Def.Ex. D, 60). The magistrate found probable cause and had the plaintiff detained for a preliminary hearing. (Def.Ex. D, 79). On June 11, 1999, a Preliminary Hearing was held before another Magistrate, who found sufficient evidence existed to hold Plaintiff for a jury trial. (Def.Ex. U). Plaintiff was then returned to prison until he was tried on November 2–3, 1999. At trial, plaintiff was found not guilty. (Pl.Ex. 6).

### III. Summary Judgment Standard

A motion for summary judgment shall be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. In doing so, he need not support the motion with affidavits or other materials negating the opponent's claim. Rather, the moving party can discharge the burden by showing that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has satisfied this burden, the non-moving party must present evidence that there *is* a genuine issue of material fact. The non-moving party may not simply rest on pleadings, but must go beyond the pleadings in presenting evidence of a dispute of fact. *See Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *See Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir.1993).

### IV. Discussion of Federal Claims

Plaintiff claims that the defendant violated his Fourth Amendment right to be free from unreasonable seizures. *See California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The Fourth Amendment is incorporated against the states via the Fourteenth Amendment. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The proper inquiry in a Section 1983 claim under the Fourth or Fourteenth Amendment of the Constitution is whether the arresting officer had probable cause to make the arrest at the time of the arrest.

Probable cause existed if "at the moment the arrest was made ... the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Vazquez had been involved in the shootout on May 5, 1995. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). *See also Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir.1997).[2]

---

**2.** The existence of probable cause is usually a question for the jury, but a judge may decide the probable cause issue on summary judg-

ment where no genuine issue of material fact exists.

The plaintiff argues that Rossnagle did not have probable cause to arrest him, because the eyewitness identification was unreliable and because Rossnagle refused to allow the plaintiff to submit to a gunpowder residue test and disregarded other exculpatory evidence.

## A. The Eyewitness Identification

### 1. The Show–Up

■ In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court held that "to violate due process an identification must be unnecessarily suggestive and create a substantial risk of misidentification." The identification of Vazquez by Irby was neither unnecessarily suggestive nor unreliable. Although show-ups are generally considered more suggestive than line-ups, *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a number of Circuit courts have held that show-ups are justifiable under certain circumstances:

> "Immediate show-ups can serve … important interests. For example, show-ups allow identification before the suspect has altered his appearance and while the witness' memory is fresh." … In our view, such considerations will justify a show-up in a limited number of circumstances, such as where the police apprehend a person immediately after the crime and in close proximity to the scene.

*United States v. Funches,* 84 F.3d 249, 254 (7th Cir.1996), citing *U.S. v. Sleet,* 54 F.3d 303 (7th Cir., 1995); *see also Johnson v. Dugger,* 817 F.2d 726, 729 (11th Cir.1987); *U.S. v. Watson,* 76 F.3d 4, 6 (1st Cir.1996).

In *U.S. v. Gaines,* 450 F.2d, 186, 197 (3d Cir.1971), the Third Circuit held that a show-up conducted without counsel was justified by "the fact that the eye-witnesses might have quickly departed, and the considerations of reliability inhering in an immediate identification." *Id.* In this case, the Bethlehem police officers conducted the show-up immediately after the shootout in close proximity to the alleged scene of the shootout. The show-up was therefore justifiable on the grounds described above.

■ The show-up procedure in this case also did not create a substantial likelihood of misidentification. In order to judge whether there was a substantial likelihood of misidentification, the court must look at the reliability of the identification in light of the "totality of the circumstances." *Government of Virgin Islands v. Riley,* 973 F.2d 224, 228 (3d Cir. 1992). The court should consider factors such as the witness' original opportunity to observe the defendant, the degree of attention during the initial observation, the accuracy of the initial description, the witness' degree of certainty when viewing the defendant at the confrontation, and the elapsed time between the crime and the identification. *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375.

■ According to the factors delineated in *Neil,* the Court finds that Irby's identification was reliable. First, Irby has testified that he was able to observe the suspect during the shootout, because the suspect was jogging backwards while shooting, thereby facing Irby's stopped car. (Def.Ex. E, 18, 20–21). Second, Irby provided the police with an accurate and relatively detailed description of the suspect.[3] Third, Irby identified Vazquez

---

**3.** There is some dispute between the parties over the accuracy of the description. Irby has at times referred to Vazquez as wearing a yellow shirt and at other times as wearing a yellow tank top (Def.Ex. E, 4, 8). Officer Israel testified that the radio description of

immediately and without hesitation at a show-up, which took place only a few minutes after the shoot-out. (Pl.Ex. 3, 29). Irby's identification was reliable.[4]

### 2. Police Statements to Irby prior to the Show–Up

■ The plaintiff argues that Rossnagle made suggestive statements to Irby prior to the identification, thereby rendering Irby's identification unreliable. Plaintiff points to the following exchange at Irby's preliminary hearing:

> Rossnagle: Were you aware of this individual or the other three individuals, where their locations may be, at this point when you were talking to me? Irby: No. No, I didn't until I, -until— until you pulled up and then, you know, I just told you the guy with the yellow shirt and a couple of cars had him under surveillance up there anyway by the bar up there.

(Def.Ex. E, 8–9). Plaintiff interprets this statement to mean that Rossnagle suggested to Irby that the "culprit was under surveillance by the police." (Plaintiff's Motion for Summary Judgment). Irby's answer, however, does not suggest that the police made any statements at all to Irby about the show-up. Even if the police did make statements to Irby about the show-up, nothing in Irby's answer suggests that the police used the word "culprit" or even "suspect".

It is important to note that even statements that appear to be suggestive are not necessarily unconstitutional. As this Court has held, "whatever the police actually say to the viewer, it must be apparent to him that [the police] think they have caught the villain... a showup is by its very nature suggestive, and the police officer's words ordinarily will not increase the suggestiveness already inherent in the format."

*McGrath,* 89 F.Supp.2d at 581, citing *United States ex rel. Richardson v. Rundle,* 382 F.Supp. 633, 638 (E.D.Pa.1974). There is simply nothing in the record to support the claim that Rossnagle made statements to Irby that increased the inherent suggestiveness of the show-up format. *See McGrath,* 89 F.Supp.2d at 581.

For all of these reasons, the Court holds that Irby's identification of Vazquez was not unnecessarily suggestive and was, in fact, reliable under the totality of the circumstances. This identification gave Rossnagle probable cause to arrest Vazquez. *See Sharrar v. Felsing,* 128 F.3d at 818, citing *Grimm v. Churchill,* 932 F.2d 674, 675 (7th Cir.1991)("When an

---

[*] the suspect stated that he was wearing a yellow shirt. (Def.Ex. F, 43). Officer Strawn, who was present when Officer Israel detained Vazquez, has testified that the description put out over the radio stated that the suspect was wearing a yellow jacket. Rossnagle testified that Irby described the suspect as wearing a yellow t-shirt, that the description he placed over the radio stated that the suspect was wearing a yellow t-shirt, and that Vazquez was, in fact, wearing a yellow t-shirt (Pl.Ex. 3, 18–19, 28). The Court finds that these discrepancies do not render the description inaccurate. Irby identified the suspect by his approximate age, his ethnicity, the color of his clothing, and his approximate location. When asked for clarification, Irby also stated that the suspect had been wearing a baseball cap. Vazquez matched this description accurately.

4. The plaintiff's complaint alleges that Irby "was a known drug addict who defendant had knowledge was extremely unreliable." This allegation is not supported by the record. Rossnagle has testified that he had no reason to question Irby's truthfulness and had no prior knowledge of Irby. (Def.Ex. E, 15, 24). Vazquez also testified during his deposition that he had no information that "Officer Rossnagle knew if Irby was unreliable at the time that Mr. Irby spoke to Officer Rossnagle" on the day of the shootout. (Def.Ex. G, 151).

officer has received his information from some person—normally the putative victim or an eyewitness—who it seems reasonable to believe is telling the truth, he has probable cause."); *see also Daniels v. U.S.,* 393 F.2d 359, 361 (D.C.Cir.1968).

### B. Allegedly Exculpatory Evidence

■ The plaintiff alleges that the defendant violated his constitutional rights by not allowing him to take a gunpowder residue test and by disregarding other potentially exculpatory evidence. Once the defendant had established that there was probable cause for an arrest, however, he did not need to confirm his finding of probable cause through additional investigations. In *Merkle v. Upper Dublin School District,* 211 F.3d 782 (3d Cir.2000), the court stated:

> [The defendant] had every reason to believe a credible report from a school principal who witnessed the alleged crime. This report alone sufficiently established probable cause. [The defendant] was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed.

*Id.* at 790. In *Walker v. Spiller,* 54 F.Supp.2d 421 (E.D.Pa.1999), the court held:

> A police officer's failure to investigate a suspect's alibi does not "negate the probable cause for the warrantless arrest in the absence of a showing that the [officer's] initial probable cause determination was itself unreasonable."

*Id.* at 426, citing *Romero v. Fay,* 45 F.3d 1472, 1477–78 (10th Cir.1995). Irby's identification sufficed to give Rossnagle probable cause for the initial arrest. Rossnagle was thereafter under no obligation to give Vazquez a gunpowder residue test or conduct other investigations in order to either confirm or negate his initial, reasonable finding of probable cause.

Even had Officer Rossnagle been under an obligation to conduct further investigation, the record suggests that neither a gunpowder residue test nor the other potentially exculpatory evidence could have negated the probable cause for Vazquez' arrest. First, the defendant has submitted an expert report, in which Dr. James Fyfe states: "As reasonable and competent police officers, investigators, and administrators know, gunshot residue tests are usually not dispositive of whether an individual fired a gun... In the best of circumstances, such residue remains on the hands for only a short time, and is easily removed by intentional or unintentional washing." (Def.Ex. O).

■ Second, the record does not support the contention that Rossnagle disregarded other exculpatory evidence. After the initial detention of Vazquez, Rossnagle conducted an investigation of the scene and found shell casings and bullet fragments at the site of the shootout. The shell casings were found on the north side of Broadway St. and the bullet fragments on the south side of the street. (Def.Ex. D, 33). According to Irby's eyewitness testimony, the suspect in the yellow shirt had been shooting from the south side of the street. (Def.Ex. D, 33–34). Vazquez argues that this evidence is exculpatory, because it suggests that Vazquez could not have fired those shots. In addition, Vazquez alleges that Rossnagle and other officers were aware of a lead regarding another suspect. Officer Rossnagle testified in his deposition that he understood that other officers were following up on that lead. (Def.Ex. D, 35). The fact that Rossnagle found evidence that there was a shooter other than Vazquez did not negate the existing probable cause for Vazquez' arrest. According to Irby's testimony,

four individuals had been involved in the shootout. (Def.Ex. D, 16). Thus evidence of another shooter cannot be considered exculpatory. Rossnagle did not violate Vazquez' constitutional rights by disregarding this evidence.[5]

## V.  Discussion of State Law Claims

Vazquez also alleges state law claims for false arrest and false imprisonment against Rossnagle. The Pennsylvania Supreme Court has laid out the standard for false arrest and imprisonment claims as follows:

> The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of the detention. An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not. *Fagan v. Pittsburgh Terminal Coal Corporation*, 299 Pa. 109, 149 A. 159 (1930). Probable cause exists when "the facts and circumstances which are within the knowledge of the police officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Rodriguez,* 526 Pa. 268, 273, 585 A.2d 988 (1991).

*Renk v. City of Pittsburgh,* 537 Pa. 68, 76, 641 A.2d 289 (1994).

█  The Pennsylvania standard for probable cause is thus identical to the standard outlined for the federal claims. The Court therefore grants summary judgment to defendant Rossnagle on the plaintiff's state law claims for the same reasons stated above.

## VI.  Decision

The Court finds that Officer Rossnagle had probable cause to arrest Vazquez and that he therefore did not violate Vazquez' rights under the Constitution or under state law. Because the Court holds that there was no constitutional or state-law violation, the Court does not have to reach the question whether Officer Rossnagle would be entitled to qualified immunity. For all of the above reasons, the Court grants summary judgment in favor of the defendant, Frank A. Rossnagle.

### ORDER

**AND NOW,** this 15 day of February, 2001, upon consideration of the defendant's Motion for Summary Judgment and responses thereto and after an oral argument on the motion, it is hereby **ORDERED** and **DECREED** that the said Motion is **GRANTED** for the reasons stated in a memorandum of this date.

---

**5.** Plaintiff also alleges that Officer Rossnagle manufactured a confession on the part of the plaintiff. Rossnagle testified that Raymond Vazquez used the phrase "we were shooting" twice while being interviewed at the police station. (Def.Ex. D, 48). Vazquez denies having used the phrase "we were shooting." (Def.Ex. G, 130). Viewing all evidence in the light most favorable to the plaintiff, the court assumes for purposes of this motion that Vazquez did not use the phrase "we were shooting". Nonetheless, Rossnagle's testimony does not negate the initial probable cause. As discussed above, Irby's identification gave Rossnagle probable cause to arrest. Vazquez' alleged confession was therefore neither necessary for nor relevant to Rossnagle's initial probable cause determination.