**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3042
_____

UNITED STATES OF AMERICA

v.

DAVID ROBINSON
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-16-cr-00144-001)
District Judge: Hon. Juan R. Sanchez
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 1, 2020
_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL, *Circuit Judges*.

(Opinion Filed: August 12, 2020)
_____

OPINION*
_____

GREENAWAY, JR., *Circuit Judge*.

    In this case, we must decide whether the District Court erred in denying Defendant

_____

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not
constitute binding precedent.

David Robinson's motion to suppress physical evidence and witness identifications. For the reasons set forth below, we will affirm.

## I. BACKGROUND

Defendant-Appellant David Robinson ("Robinson") was charged with two counts of bank robbery in violation of 18 U.S.C. § 2113(a). The charges arose out of two bank robberies that Robinson committed in Philadelphia, one on March 19, 2016 (during which Robinson took $3,030) and one on March 21, 2016 (during which Robinson took $1,190). During both robberies, Robinson did not conceal his appearance or clothing, which was the same in both robberies. Robinson was recorded on surveillance cameras and was observed by individuals inside the banks during the robberies.

The FBI circulated photographs and a detailed physical description of the robbery suspect to local law enforcement after both robberies. The notices described the perpetrator as: "Age, late 30s to early 40s, black male with a large build, approximately 350 pounds, five-ten to six-feet in height. His facial hair was a beard and his closing [sic] was a gray knit hat, gray shirt, gray sweatpants, gloves and a black cane. . . ." A49. The notices also described the suspect as armed and dangerous.

On March 21, 2016, Akaga Campbell, a U.S. Probation Officer in Philadelphia, informed the FBI that she knew that Robinson was the suspect because she was his supervising probation officer. The U.S. Probation Office then obtained a warrant for Robinson's arrest for a violation of his terms of supervised release.

On March 22, 2016, a Southeastern Pennsylvania Transportation Authority ("SEPTA") police officer, Jeffrey McKee, saw Robinson while he was on patrol near the

2

location of the March 21 bank robbery. McKee recognized Robinson from the FBI notices on the bank robberies, which he had reviewed that morning before beginning his patrol. Robinson matched the physical description and photographs and was wearing the same clothing and carrying the same cane as described. McKee radioed for backup and then approached Robinson. He ordered Robinson to put his hands in the air, but Robinson "kept reaching around in his waistband." A54. McKee then drew his service weapon and commanded Robinson to face the wall with his hands in the air. Robinson complied. Two police officers, Sean Munro and Logan Johnson, arrived and put Robinson into custody. The officers secured Robinson with handcuffs and patted him down for weapons. Although they ran a warrant search on Robinson, they could not recall whether they became aware at that time that there were outstanding warrants for Robinson's arrest.

While Robinson was being detained, SEPTA officer Martin Zitter brought two bank employee witnesses from the March 21 bank robbery to the scene of the stop to try to verify whether Robinson was the perpetrator (the "show-up identification"). Zitter informed the witnesses that the police had stopped someone "that could or could not be a person that had robbed the bank yesterday." A103. Both witnesses immediately identified Robinson as the perpetrator of the robbery and "seemed very adamant about whom they were looking at." A107. At the time of the show-up identification, Robinson was in handcuffs and eight to twelve officers were in the immediate vicinity. Approximately twenty to thirty minutes elapsed between the stop and the positive identifications.

3

Officer Munro then transported Robinson to the FBI offices, where he learned that there was an outstanding warrant based on Robinson's supervised release violation. FBI Special Agent Percy Giles subsequently interviewed both witnesses, who again confirmed that they were "a hundred percent" certain that Robinson was the perpetrator of the robbery and that their identifications were based on their own recollections. A139–40.

Robinson moved to suppress: (1) the clothing that the police seized from him when he was arrested and (2) the positive show-up identifications. He argued that he was subjected to a warrantless arrest without probable cause and that the identification procedure was unduly suggestive. The District Court held an evidentiary hearing, at which McKee, Munro, Zitter, and Giles testified. The District Court then denied the motion to suppress on the ground that, even though the show-up procedure was suggestive, the employees' identifications of Robinson were reliable.

Robinson subsequently entered a conditional guilty plea on both counts. The District Court sentenced him to 151 months' imprisonment. This timely appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1). "We review a district court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise plenary review over its application of the law to those facts." *United States v. Burnett*, 773 F.3d 122, 130 (3d Cir. 2014). "We construe the record in the light most favorable to the government." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

4

## III. DISCUSSION

### A.    Robinson Was Not Unlawfully Arrested

Robinson first contends that the physical evidence and show-up identifications must be suppressed because he was subjected to an unlawful arrest in violation of the Fourth Amendment.  We disagree.

Evidence found as a result of a search and seizure may be suppressed only if the search and seizure were unreasonable.  *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).   An officer may perform an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), if the officer has "a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  McKee had reasonable suspicion to stop Robinson because Robinson matched the photographs and detailed description in the FBI notices.  Robinson does not dispute this.  Rather, he argues that the stop became an unlawful arrest, rather than merely an investigatory stop, because McKee pulled his weapon and forced Robinson up against a building and because Munro and Johnson conducted a frisk, used handcuffs, and detained Robinson for twenty to thirty minutes before the show-up identifications.

This argument is unavailing.  "In effectuating a valid stop, police officers are allowed to use a reasonable amount of force."  *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004).  An officer may perform a pat down of the suspect if the officer has reasonable suspicion that the suspect is armed and dangerous.  *See id.* at 216.  Further, "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."  *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (citing cases).

5

Likewise, "there is no per se rule about the length of time a suspect may be detained before the detention becomes a full-scale arrest." *Id.* at 1192. Whether the officer's use of force and the duration of the detention converted the stop into an arrest depend on the circumstances. *See id.* at 1192–93.

Here, McKee testified that the FBI notice describing Robinson stated that he was armed and dangerous. McKee also testified that Robinson failed to comply with his first order to put his hands up and kept reaching for his waistband. These facts provided justification for McKee to pull his weapon and for the other officers to handcuff and frisk Robinson to effectuate the valid *Terry* stop. *See United States v. Edwards*, 53 F.3d 616, 618 (3d Cir. 1995) ("[A] police officer, during the course of a *Terry* stop, may conduct a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." (internal quotation marks omitted)).

Nor did the duration of Robinson's detention convert the stop into an arrest under the circumstances. Of particular importance is "whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible." *Baker*, 50 F.3d at 1192; *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). The purpose of this stop was to determine whether Robinson was the perpetrator of the bank robberies. Officers promptly went to find

witnesses who could identify Robinson.  There is no indication that McKee or any other officer engaged in any dilatory conduct.  Considering the circumstances as a whole, we agree with the District Court that Robinson was not subjected to a warrantless arrest prior to the show-up identifications.  He was only put under arrest after two witnesses identified Robinson, which provided the officers with probable cause.  We will therefore affirm the District Court's denial of Robinson's motion to suppress the physical evidence and show-up identifications as the fruit of an unlawful arrest.

**B.      The Show-Up Identifications Were Reliable**

Robinson also argues that the show-up identifications should be suppressed because they violated his rights under the Due Process Clause.  Again, we disagree.

An identification procedure violates the Due Process Clause if it is "unnecessarily suggestive" and results in a "substantial risk of misidentification."  *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995) (quoting *Gov't of the V.I. v. Riley*, 973 F.2d 224, 228 (3d Cir. 1992)).  An identification resulting from an unduly suggestive identification procedure need not be suppressed if the identification "possesses sufficient aspects of reliability, for reliability is the linchpin in determining the admissibility of identification testimony."  *Id.* (internal quotation marks omitted).  To determine whether an identification is reliable, we consider: (1) the witness's opportunity to observe the perpetrator during the commission of the crime; (2) how attentive the witness was at that time; (3) whether the witness has provided a prior accurate description of the perpetrator; (4) the witness's level of certainty at the time of the identification; and (5) the length of

7

time between the crime and the witness identification. *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

We need not decide whether the show-up identifications were unduly suggestive because the District Court correctly decided that the identifications were reliable. Both witnesses were able to observe Robinson closely during the commission of the crime. Robinson did not disguise his appearance during the robberies. The first witness said that he watched Robinson enter the bank and approach the teller. He was approximately twenty feet away from Robinson. The other witness was the teller that Robinson approached to demand the money. She too had ample opportunity to take note of Robinson's appearance, as she was only one hand length away from Robinson.

Both witnesses provided detailed descriptions that were very similar to Robinson's appearance. On the day of the robbery, the first witness described the perpetrator as "a black male, late 30s to early 40s, having the approximate height of five-foot-nine inches to five-foot-ten, moustache, beard, having an approximate weight of 350 pounds, wearing a gray knit cap, black shirt, gray undershirt, gray sweat pants, gloves, dark colored cane." A126. The second witness described the perpetrator as "[a] black male, five-foot-seven inches tall, mid-30s, medium complexion, black hoody, zip up, gray . . . sweats, black gloves and a black beanie. He was also carrying a wooden stick or cane." A128.[1]

---

[1] At the scene of the crime, the second witness initially described the perpetrator as light skinned with facial hair, wearing a dark sweatshirt and gray skull cap, and six-feet tall, two hundred plus pounds. These descriptions are sufficiently similar that they do not undermine the reliability of the identification.

These descriptions are very similar to Robinson's appearance at the time of the identification and in the photographs from the banks during the robberies. Both witnesses expressed complete certainty about their identifications. Finally, they identified Robinson the day after the bank robbery took place, when their recollections were still fresh.

Thus, since the *Biggers* factors indicate that the identifications were reliable, we conclude that the District Court did not err in denying Robinson's motion to suppress the identifications.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the order denying the motion to suppress.